## ʃ Jaques *against* Weeks.

The act of the 19th February 1835, to make valid the acknowledgement and probate of deeds made before officers, and dispensing with the necessity of a seal, is applicable to acknowledgements and probates made before commissioners for Pennsylvania in the other states, who are officers within the meaning of art. 2, sect. 8 of the constitution of Pennsylvania.

Whatever puts a party upon inquiry amounts, in judgment of law, to notice, provided the inquiry becomes a duty, as in case of purchasers and creditors, and would lead to the knowledge of the requisite fact by the exercise of ordinary diligence and understanding. But notice of a rumour of conveyance or incumbrance seems not to be considered as either actual or implied notice.

A deed and separate defeasance constitute in effect but one instrument, operating as a security for money, and not as a conditional sale, and are to be considered and treated as a mortgage, and all the consequences appertaining in equity to a mortgage are to be strictly observed, and the right of redemption is to be regarded as an inseparable incident.

A mortgage thus constituted, the recording of the conveyance without the defeasance is not sufficient, within our recording acts, as against a subsequent *bona fide* purchaser or creditor of the grantor without any other notice.

If a purchaser have notice of the fact of the existence of such a deed and defeasance, he is in equity bound to the same extent and in the same manner as the person of whom he purchased.

But the law is otherwise as regards a judgment creditor, or the purchaser under an execution on such judgment, inasmuch as a judgment has priority over an unrecorded mortgage.

A general possession of land is sufficient notice of the title of the possessor ; but knowledge of the possession has not the effect of visiting the purchaser with notice of every fact and circumstance which he might have learned by making inquiry of the possessor.

*WRIT* of error to the common pleas of *Tioga* county.

This was an action of ejectment by Samuel C. Jaques against Samuel Weeks and Lewis Saynisch for two hundred and eighteen acres of land, the original title to which the parties admitted to have been regularly vested in John H. Knapp.

The plaintiff gave in evidence a deed from John H. Knapp and wife to Asbury Crocheron for seven-eighth parts of the land in dispute, dated 7th April 1829, and recorded 20th July 1829, and a deed from Asbury Crocheron and wife to himself Samuel C. Jaques, dated 20th June 1831, and recorded on the 11th November 1831.

The defendants, to maintain the issue on their part, offered in evidence a deed of defeasance for the same land from Asbury Crocheron to John H. Knapp dated the 7th April 1829. John H. Stephenson was a subscribing witness to this deed, and it was proved by him before Thomas M'Elrath, a Pennsylvania commissioner resident in

VII.—X

[Jaques v. Weeks.]

the state of New York, who certified the probate under hand without a seal.   This evidence was objected to by the plaintiff, on the ground that the deed was not proved and certified according to law ; that the act of the 14th April 1828 required the commissioner to certify "under his seal." Yet the court below was of opinion that the defect was cured by the act of the 19th February 1835, and overruled the objection and sealed a bill of exception.

This deed of defeasance was not recorded.

The defendant then gave evidence, that John H. Knapp remained in the possession of the land after the date in the deed to Asbury Crocheron, and until he left the country in May 1833 ; and then a a deed from John H. Knapp and wife to Samuel Weeks the defendant, dated the 15th April 1833 : the consideration was 500 dollars, and it embraced the whole of the two hundred and eighteen acres of land.   Also a deed from Samuel Weeks to Ellis Lewis, dated 27th June 1834, for the consideration of 75 dollars, and from Ellis Lewis to Lewis Saynisch of the same date, and recorded 23d September 1834.

The defendants, further to maintain the issue on their part, gave in evidence another title, to wit, a judgment of William Willard, Jun. for the use of Levi Cooly against John H. Knapp for 120 dollars, entered the 20th June 1832, upon which a *fieri facias* was issued in 1835 and levied on the land in dispute : a *venditioni exponas* was issued and the land was sold by the sheriff to John W. Gurnsey for 30 dollars, who received the sheriff's deed therefor dated 31st December 1835, and conveyed it to Lewis Saynisch by deed dated 27th February 1836 for the consideration of 100 dollars: at the sale express notice was given of the plaintiff's title.   Lewis Saynisch went into the possession of the land under his first title in July or August 1833, soon after John H. Knapp left it, and moved his family to it in the spring of 1835.   Weeks and Saynisch both had improvements made and work done on the land in the spring of 1834.

The plaintiff, to rebut the effect of the evidence given by the defendants, offered to prove that from 1830 to 1833 it was generally reported in the neighbourhood that John H. Knapp had sold out all his interest in the land to Crocheron, and that such report was communicated to Weeks the defendant.

The plaintiff objected to the evidence, and the court rejected it and sealed a bill of exception.

The plaintiff then called many witnesses to prove that Samuel Weeks knew of the title of Crocheron in the fall of 1832, before he purchased from Knapp ; the testimony of some of them was as follows :

Isaac Baldwin " deposes and says, that he had several conversations with said Samuel Weeks, concerning lands at or near Blossburg, Tioga county, Pennsylvania, formerly owned by John H. Knapp ; that he had conversations with said Weeks, on said subject, in the fall of the year 1832, or the following winter; and that said Weeks

[Jaques v. Weeks.]

then said to him, said Baldwin (who was .then one of the assignees of said Knapp, under the insolvent laws of the state of New York), that the said Weeks wished to procure a deed from him, said Baldwin, for said land ; was willing to give for such deed 100 dollars ; that said Baldwin then gave said Weeks no definite answer, but spoke of said Jaques's title to said land, and asked him of what use a deed would be from him, said Baldwin; to which said Weeks replied, that he was aware of said Jaques's title, and remarked that in Pennsylvania it made not much difference from whom a man obtained his deed so that he had one ; that he, said Baldwin, then told him he would give him an answer the next time he saw him.　Said Baldwin further says, that according to the best of his recollection, said Weeks called upon him again the ensuing spring, 1833, and again asked him for the deed of said land, and repeated his offer of 100 dollars; that he, said Baldwin, then declined giving such deed, and remarked to said Weeks, that he did not know that he had a right to give such deed; that he had understood that said Knapp had previously deeded away said land ; said Weeks replied, that he had the possession, and if he could get a deed to make a show of title, he could give them a great deal of trouble ; and that he was determined to hold on to the possession as long as he could ; said Baldwin further says, that he has had frequent conversations with said Weeks, previous to the said last mentioned conversation, in all of which said Weeks spoke of the deed and expressed his desire to obtain one from him ; and such conversation was substantially the same in relation to Jaques's title as the said first mentioned conversation."

James Dunn deposes and says, "that he had a conversation with the defendant, Samuel Weeks, concerning lands lying at or near Blossburg, Tioga county, Pennsylvania, in the spring of the year 1833, in the month of May, as he now thinks ; that at the time of said conversation, Isaac Baldwin and William Dunn (assignees of said John H. Knapp, under the insolvent laws of the state of New York) were, as he thinks, present ; that they, the said Baldwin, William Dunn and said Weeks, called on him, said James Dunn, to consult him in relation to the propriety of said assignees making a deed to said Weeks of said land ; that said Weeks seemed anxious to procure such deed for a small consideration ; that he, said James Dunn, as he thinks, remarked to them, the said assignees and said Weeks, that said Knapp had previously, and before said assignees could have acquired any title to said lands, conveyed the same to a gentleman in the city of New York, and that he thought such deed from said assignees would be useless, and that he thought for other reasons that they could not legally give such deed ; and in accordance with the advice of said James Dunn, said assignees declined giving such deed ; said Weeks, in said conversation, seemed to be well aware that said Knapp had previously conveyed. away said land, but supposed that said deed which he wished as above stated

to procure might be of service to him by enabling him to hold possession or to redeem in some other way ; and said James Dunn thinks that he had frequent conversations with said Weeks, concerning said land prior to the said conversations in the spring of 1833, the particulars of which he cannot now remember: and said James Dunn further says, that he drew the deed by which said Knapp and wife conveyed said lands to Asbury Crocheron, of the city of New York, in the year 1830, and was familiar with the title and situation of said property, and being well acquainted with said Weeks, they seldom or never met without having conversation concerning said lands ; and this deponent, said Dunn, further says, that in the fall of the year 1833 (in September as he thinks), he had a conversation with said Weeks at Wellsboro', Pennsylvania, concerning said lands ; that said Weeks then remarked to him, that he, said Weeks, had received a letter from said Jaques on the subject of said property, and that he, said Weeks, had written said Jaques an answer, which he thought said Jaques would be puzzled to understand, as he had written it in a guarded and obscure manner, or words to that effect."

There was much other evidence given on this subject.

The plaintiff requested the court to charge the jury upon the following points :

That the plaintiff has shown a regular legal paper title from the commonwealth to himself for the land mentioned in the writ.

Answer.   This is correct.

That if the jury believe that Samuel Weeks had actually express and positive notice of the claim of plaintiff, or Crocheron under whom the plaintiff claims, previous to the date of the deed from Knapp to him, the plaintiff is entitled to recover under all the facts disclosed in this cause.

Answer.   The court think otherwise.

That if the jury believe the testimony of Isaac Baldwin, James Dunn and John Gray, the facts sworn to by them would, in point of law, amount to actual, express and positive notice.

Answer.   The jury will judge from all the evidence in the cause.

That the deed from John H. Knapp to Asbury Crocheron of the 7th of April 1829, being regularly recorded, was constructive notice to Samuel Weeks and Lewis Saynisch, and gives to the plaintiff a title superior to the defendants', derived from John H. Knapp to said Weeks, of the 15th of April 1833.

Answer.   The court think otherwise, because the defeasance was not recorded.

That if the jury believe that Lewis Saynisch had actual, positive and express notice of the sale from John H. Knapp to Asbury Crocheron before he purchased from Ellis Lewis under the deed from said Weeks to said Lewis, he has no defence under the title to the plaintiff's claim.

Answer.   The court think otherwise.

That the deed of Benjamin Gitchel to John W. Gurnsey, and by

[Jacques v. Weeks.]

him transferred to Lewis Saynisch, under the facts disclosed in this cause conveys to said Saynisch no title that is superior to the plaintiff's, and as an outstanding title purchased in since suit brought cannot avail the defendants.

Answer.   The court think otherwise.

That if the jury believe all the evidence in this cause on the whole facts, the plaintiff is entitled to a verdict.

Answer.   The court think otherwise.

The defendants requested the court to charge the jury upon the following points:

That the conveyance from Knapp to Crocheron and the defeasance executed by Crocheron to Knapp are to be considered together as constituting a mortgage,

Answer.   This the court think is correct.

That inasmuch as this mortgage has not been recorded as required by the act of assembly, it vests no interest in Crocheron so as to affect the rights of third persons; and that it is not a lien upon the land.

Answer.   This is correct.

That if the jury believe that Knapp remained in notorious and exclusive possession of the premises from the time of the conveyance to Crocheron until the conveyance from him to Jaques, such possession was constructive notice to Jaques, and sufficient to put him upon inquiry as to the claim of title by which Knapp held possession.

Answer.   The court think this is correct.

That if the jury believe that Weeks had sold the land in question and delivered the possession to Saynisch before the commencement of this suit, and that Saynisch alone has continued in the possession, then the conversations and declarations made by Weeks cannot affect the rights of Saynisch.

Answer.   This the court think correct.

That the conversation testified to by John Gray with Lewis Saynisch is not actual, positive and express notice to Saynisch of the claim of Crocheron or Jaques, so as to affect his (Saynisch's) title.

Answer.   The court think this correct.

Verdict and judgment for the defendants.

The plaintiff below assigned for error the opinion of the court as contained in the bills of exception, and their instruction to the jury in answer to the points.

*Parsons* and *Hepburn*, for plaintiff in error, contended that the object of the recording acts was to give notice; and that if actual notice was given in any other way, the deed or mortgage was as effectual as to those who possessed the knowledge of the fact.   Cited, 1 *Penns. Blac.* 431; 1 *Dall.* 430; 4 *Dall.* 153; 1 *Yeates* 172; 7 *Serg. & Rawle* 292; 13 *Serg. & Rawle* 168; 2 *Binn.* 502; 4 *Binn.* 147; 2 *Binn.* 43, 466; 8 *Serg. & Rawle* 373; 3 *Yeates* 354; 3 *Binn.* 348;

[Jaques v. Weeks.]

*3 Serg· & Rawle* 429; *2 Watts* 78, 463, 275; *1 Yeates* 291; *5 Binn.* 251, 499; *3 Mass. Rep.* 574; *2 Mass. Rep.* 506; *4 Mass. Rep.* 541; *10 Mass. Rep.* 60; *5 Mass. Rep.* 438; *6 Mass. Rep.* 30, 487; *11 Mass. Rep.* 153; *14 Mass. Rep.* 296; *7 Pick.* 157; *15 Johns. Rep.* 568; *10 Johns. Rep.* 374, 457; *9 Johns. Rep.* 161; *2 Har. Dig.* 910; *5 Barn. & Ald.* 142; *1 Stra.* 664; *2 Eq. Ca. Ab.* 282, 684; *4 Kent's Com.* 141.

*Williston* and *Greenough*, for defendant in error, cited, act of 28th of March 1820; *Sug. Vend.* 498; *7 Serg. & Rawle* 290; *3 Penns. Rep.* 240; *1 Penns. Rep.* 447; *4 Rawle* 255; *14 Serg. & Rawle* 256; *17 Serg. & Rawle* 70.

The opinion of the Court was delivered by

SERGEANT, J.—On the trial of this cause the defendant offered a paper dated the 17th of April 1829, called a deed of defeasance from Asbury Crocheron to John H. Knapp, which was proved by the oath of John H. Stephenson, the subscribing witness, before Thomas M'Elrath, commissioner for Pennsylvania in the state of New York. The plaintiff objected to it, on the ground that the instrument was not proved according to law; but the court overruled the objections, and sealed a bill of exceptions.

The certificate of the commissioner is given under his hand alone, without a seal, and the question is, whether it is not on that account defective.    The act of the 14th of April 1828 appears to have been the first which was passed by our legislature for the appointment of commissioners in other states, to take the acknowledgement and proof of conveyances of lands lying in this state, as well as other documents to be used or recorded here: and this act required the acknowledgement or proof to be certified by the commissioner "under his seal." But the requisition of a seal in certificates of this description being found inconvenient, a supplement was passed on the 19th of February 1835, by which all acknowledgements or probates of deeds, &c. theretofore taken or made, or which should thereafter be taken or made, were to be construed to have the same effect, to all intents and purposes, although the same might have been certified by the *officers* before whom such acknowledgement or probate was made under their hands only, as if the same had been certified under their hands and seals, and declaring the omission of the seal in any certificates theretofore made, or thereafter to be made, should not avoid or prejudice the instrument.

It is contended by the plaintiff, that this supplementary act does not embrace the case of a certificate by a commissioner; that he is not to be considered as an officer within the meaning of the law; but that it contemplates only the proceedings of judges, justices and others acting within this state.    There seems to be no sufficient reason for making this distinction.    Deeds acknowledged or proved out of the state are as much within the evil intended to be remedied as

[Jaques v. Weeks.]

those within it; and perhaps even more so.   These commissioners may strictly and properly be considered as officers, within the meaning of article 2, section 8 of the constitution, being appointed by the governor of the state, by the direction of its laws, and acting under its authority.   They are so treated in the act of 14th of April 1828, by which the governor is authorized to appoint and commission one or more commissioners, " which commissioners *shall continue in office* during the pleasure of the governor."   They are moreover authorized to administer oaths and affirmations.   The language of the act of 1835 is general, applying to " *all* acknowledgements or probates," without limitation by territorial lines or otherwise.   I think that the defeasance was properly admitted in evidence by the court below.

The next bill of exceptions is to the rejection by the court below of evidence offered by the plaintiff, that from the year 1830 down to to the year 1833 it was generally reported in the neighbourhood that John H. Knapp had sold out all his interest in that place to Mr Crocheron; to be followed by proof, that the same was communicated to Weeks, one of the defendants.

The general doctrine is, that whatever puts a party on inquiry amounts, in judgment of law, to notice, provided the inquiry becomes a duty, as in case of purchasers and creditors, and would lead to the knowledge of the requisite fact by the exercise of ordinary diligence and understanding.   Notice of a deed is notice of its contents; and notice to an agent is notice to his principal.   4 *Kent's Com.* 179.   But notice of a rumour of a conveyance or incumbrance seems not to be considered as either actual or implied notice.   Indeed to set on foot an inquiry into the foundation of mere rumours would, in most cases, be a vain and impracticable pursuit.   *Lex neminem cogit ad vana seu impossibilia.*   Kerns *v.* Swope, 2 *Watts* 78 ; Wildgoose *v.* Weyland, *Goulds.* 147 ; Cornwallis's Case, *Toth.* 254 ; Tolland *v.* Standbridge, 3 *Ves.* 478.   The evidence offered was immaterial, since if the plaintiff had traced to the defendant a knowledge that this rumour was in circulation in the neighbourhood, that Knapp had sold to Crocheron, such knowledge would not constitute that kind of notice which in equity would affect the conscience of the defendants.

I shall now proceed to consider the questions which involve the merits of the case, without following precisely in the track of the errors assigned in the answers of the court below to the numerous points presented by the respective parties.

The deed from Knapp to Crocheron, made on the 17th of April 1829, standing by itself, would convey an absolute title, but, taken in connection with the defeasance executed on the same day between the parties, is to be considered in law in the nature of a mortgage. It is all one transaction.   The deed is recited to be a security for money lent and advanced by Crocheron to Knapp, declaring that to be the purpose of the deed, with a covenant for a reconveyance, in case of the repayment of the money with interest in one year.   The deed and defeasance constitute in effect but one instrument, operating

as a security for money and not as a conditional sale, and giving to the grantor a right of redemption : and when it is once ascertained that the conveyance is to be considered and treated as a mortgage, then all the consequences appertaining in equity to a mortgage are strictly observed, and the right of redemption is regarded as an inseparable incident.   4 *Kent's Com.* 142, and cases cited.   The circumstance that there is no covenant by the mortgagor for the repayment of the money, was considered in the case of Wharf *v.* Howell, 5 *Binn.* 499, and held not to be material; because the mortgagee, might recover the premises by ejectment, or the money by *scire facias.* See also Stoever *v.* Stoever, 9 *Serg. & Rawle* 448.   The stipulation in the defeasance that on failure to pay within one year the defeasance should be void (like the clause mostly inserted, that the conveyance should be absolute), is not sufficient to overrule the legal character of the instrument as a mortgage, and to restrict the right of redemption to one year, so as thereafter to convert it into a sale of the premises.   Wharf *v.* Howell, 5 *Binn.* 499; Colwell *v.* Woods, 3 *Watts* 188; Stoever *v.* Stoever, 9 *Serg. & Rawle* 434; Kerr *v.* Gilmore, 6 *Watts* 405 ; Kemble *v.* Wolfersberger, 6 *Watts* 126.

Being then in nature of a mortgage, and attended by all the incidents of a mortgage, the next question is, whether the recording of the deed from Knapp to Crocheron, without the defeasance, is sufficient, within our recording acts, as against a subsequent *bona fide* purchaser or creditor of the grantor, without any other notice.   And I am of opinion that it is not.   Indeed, the very point was decided by this court in the case of Freedly *v.* Hamilton, 17 *Serg. & Rawle* 70.   There Henry Freedly, Jun. made an absolute deed to his father Henry Freedly, Sen., and the latter, by a separate defeasance of the same date, declared that the deed was made to secure the sum of 6000 dollars due to him, with a covenant to reconvey on payment thereof with interest by a certain day.   The deed was recorded, but not the defeasance.   Afterwards judgments were obtained against the grantor, H. Freedly, Jun., and this court held that the mortgage creditor was to be postponed to the judgment creditors in a contest between them, as to the proceeds of sale of the land.   This case I consider as a strong authority on this point, and one which ought to be binding unless it clearly appeared that the court were mistaken in point of law.   Of this, however, I am by no means persuaded.   A mortgage and a defeasible deed in nature of a mortgage are both within the express provisions of the act of 1715 and the act of the 28th of March 1820, as well as the retrospective act of the 23d of September 1783.   No reason exists why a difference should be made in the duty of the parties to put the lien on record where but one instrument is used, and where there are two.   The great object of the recording acts is, to compel those who claim a priority of conveyance or lien to place the true nature of the transaction on record, so that all may have recourse to it for correct information; but if the deed alone be recorded without the defeasance, a false notice of the

[Jaques v. Weeks.]

transaction is given. To allow this to be valid leaves it in the power of the parties to hinder and defeat purchasers and creditors, by making that which was in reality a mortgage bear the appearance of an absolute deed, or otherwise, just as it suits their purposes. The mortgagee may thus become a secret trustee for the mortgagor as to the surplus beyond the money actually due. To say that the mortgagor may or may not record the defeasance as he pleases, and that if he did not, he thereby agrees that the deed shall be absolute, is to enable a party to make it either a mortgage or absolute deed at his pleasure; whereas the character of the instruments, as has been before stated, is indelibly stamped upon them at their original formation, constituting them in law a mortgage, with all its incidents, and if it were once a mortgage it always continues to be so, not liable to be changed, in this respect, by posterior acts or omissions.

No inconvenience can arise from requiring the defeasance to be recorded as well as the absolute deed; for although ultimately the defeasance passes into the hands of the grantor, and out of the control of the grantee, yet it is in the power of the grantee to provide for the simultaneous recording of the instruments before that takes place, and his not doing so may be deemed collusion as to third persons. Besides, mortgages in this form are so much liable to accidents and abuse, that the court of chancery has frequently and very properly discouraged them. 4 *Kent's Com.* 141, and cases cited. I do not think that nice distinctions should be entertained to support the recording of but part of a transaction and the suppressing of the rest, contrary to the plain language of our acts of assembly, and contrary, it would seem, to public policy and to the furtherance of plain dealing. I am, therefore, of opinion, that the mere recording of the deed without the defeasance is inoperative and void, not authorized by act of assembly, and therefore not notice of any thing, so far as respects third persons claiming as *bona fide* purchasers or subsequent mortgagees under the mortgagor; that it is, in other words, the case of an unrecorded mortgage, and that Jaques, by his purchase from Crocheron, obtained merely a transfer of his rights as holder of such unrecorded mortgage.

Considering it then an unrecorded mortgage, the next question that arises is, whether if Weeks and Saynisch, before their purchases under the deed from Knapp, had actual notice of the existence of a claim or title in Jaques, they are not in equity affected by it. The court below charged that they were not. There is much plausibility in the argument, that the strict letter of the statute ought to be enforced, and that nothing should be allowed to dispense with the actual recording of the instrument. But when this doctrine comes to be applied in practice, it is found to be too strict to be insisted on without any exception—*summum jus* proves to be *summa injuria.* Cases occur in which such a construction of the laws would sanction injustice and reward the most palpable fraud and iniquity. Courts,

therefore, in the exercise of equity, have considered certain cases not within the intention of the lawgiver, and looked to the object and design of the recording acts, rather than their dry letter.   Hence, although the act of 1715 declares, that no deed, or mortgage, or defeasible deed in the nature of mortgages, shall be sufficient to pass any estate, unless such deed be recorded within six months, yet where the assignees of the mortgagor attempted to avail themselves of this, it was held that the mortgage was binding on the mortgagor and his representatives, though not recorded; Levinz *v.* Will, 1 *Dall.* 430; and this doctrine has ever since prevailed, as well in regard to the mortgagor and his representatives, as to all who hold under him with notice.   Stroud *v.* Lockhart, 4 *Dall.* 153.   For such purchaser with notice has been considered not a *bona fide* purchaser, but as one acting in bad faith, as a *particeps criminis*, as taking the place of his vendor; and to permit him to hold against the first purchaser, would be to convert the statute into an instrument of fraud.   There is danger, undoubtedly, in the admission of parol evidence to supply the want of a written registry; but although reasons of this kind have introduced the rigid rule into foreign codes, the mischiefs of parol evidence have not been deemed sufficient in this country and in England to set aside the strong and urgent motives for the exercise, by a court of equity, of the power to examine the circumstances of each particular case, and to prevent the fraud and imposition which would result from a strict interpretation of the laws concerning the registry of conveyances, the statutes of frauds and perjuries, and other similar enactments.   It is accordingly now a general rule that a purchaser with notice is in equity bound to the same extent and in the same manner as the person of whom he purchased.   *Sugd. Vend.* 511, 527; 4 *Kent's Com.* 171.   I am, therefore, of opinion that the court below erred in their answers on this point.

This however applies only to the title of the defendants under the deed from Knapp to Weeks and from Weeks to Saynisch.   The defendants set up another title under a deed dated the 31st of December 1835 from John W. Gurnsey, who purchased at sheriff's sale, on execution under the judgment of Willard *v.* Knapp, entered the 20th of June 1832.   And although the law with regard to a purchaser or mortgagee with notice is as I have stated, yet it seems to be different with regard to a judgment creditor, and the purchaser under an execution on such judgment.   For it has been adjudicated by this court, that a judgment creditor takes a priority over an unrecorded mortgage.   Semple *v.* Burd, 7 *Serg. & Rawle* 290.   Freedly *v.* Hamilton, 17 *Serg. & Rawle* 70.   If so, a purchaser at sheriff's sale under such judgment cannot be affected by a notice of a mortgage, which notice is given subsequently to the judgment; for if he could, it would render the mortgage not available.   It would give it a priority over the judgment, and take away the value of the judgment to the amount of the mortgage.   Notice to a purchaser at

[Jaques v. Weeks.]

sheriff's sale may affect him with a trust, as in Barnes *v.* M'Clinton, 3 *P. R.* 67, because that is in nature of a conveyance, and conveyances, though not recorded, transfer the land free of subsequent judgments. But it is otherwise with an unrecorded mortgage. There the judgment binds the land as if it remained in the mortgagor, and the purchaser at sheriff's sale is not affected by notice of an unrecorded mortgage given after the entry of the judgment, but takes the land clear of it as he does of a trust of which he has no notice. All the notice therefore given in this case to Weeks, Saynisch or Gurnsey, after the entry of the judgment against Knapp by Willard, would be unavailing against the title under the sheriff's deed to Gurnsey.

There is therefore no equity in Jaques arising from notice to the defendants as respects this title. But there yet remains another aspect in which it is necessary to consider this part of the case; and that is, how far Jaques is to be deemed to have a prior equity as a previous purchaser from Knapp without notice. For of two purchasers without notice, *qui prior est in tempore potior est in jure.*

I think it clear that if Jaques had bought the fee simple from Crocheron without any notice whatsoever of the transaction between Crocheron and Knapp, he would hold the title as well against Knapp and Crocheron as against any subsequent purchaser or creditor claiming under them. It never could be permitted to Knapp to make an absolute deed, and allow his grantee to sell under it to an innocent purchaser, and then destroy the title by producing a concealed defeasance. A *bona fide* purchaser (by which I mean one purchasing without notice), taking the title on the faith of a recorded deed executed by one having the title, would not be suffered to be defrauded by any secret collusion or private defeasance that may have existed as between his grantor and the person from whom he derived his title. A purchaser without notice holds, though his vendor had notice. The case of Freedly *v.* Hamilton was between the original parties. No purchaser from H. Freedly, Jun. prior to the judgment was interested.

Then was Jaques a purchaser without notice before the judgment? It is not pretended that Jaques had any *actual notice* of the defeasance. But it is contended that although he may not have had actual notice, yet, that before and at the time when Jaques purchased from Crocheron, Knapp remained in notorious and exclusive possession of the premises, and that such possession was constructive notice to Jaques, and sufficient to put him on inquiry as to the claim of title by which Knapp held possession. And this leads to the inquiry how far Knapp's possession was constructive notice to Jaques.

The doctrine of constructive notice seems not to be very accurately settled. It is difficult, says Mr Sugden, to say what will amount to constructive notice; *Sugd. Vend.* 534. The doctrine of notice, says chancellor Kent, is very greatly surcharged with cases abounding in refinements; it is indeed difficult to define with precision the rules

which regulate implied or constructive notice, for it depends upon the infinitely varied circumstances of the case ; 4 *Kent's Com.* 179. In 2 *Vern.* 159, it is said, equity has always been careful not to impeach purchasers by presumptive notice. In respect to possession as a ground of notice, it is said by Tilghman, C. J., in 6 *Serg. & Rawle* 184, that in general possession may be sufficient notice of the title of the possessor, but that this principle is subject to many exceptions. And it will be found that in England it has been carried to a considerably greater extent than in this country, perhaps from the circumstance that they have no registry act, except for a few local districts, and therefore other modes are favoured by which a purchaser may be apprised of an adverse claim. But even there, the cases do not seem entirely reconcilable. See *Pow. Mortg.*, notes by Coventry 576. In the case of Plumer v. Robertson, 6 *Serg. & Rawle* 184, the effect of possession in giving notice was much considered by this court. There the mortgagee, whose mortgage was duly recorded, entered into articles of agreement for the purchase of the mortgaged premises, and entered into possession without recording the articles; and it was insisted that such possession was notice of the claim under the articles ; but the court decided that it was not notice to a purchaser of the title under the articles. So in Billington v. Welsh, 5 *Binn.* 129, the possession was of part of a tract on which the possessor had erected buildings, but he had omitted to survey and mark the bounds of his claim and the buildings, so as to distinguish them from the rest, and the possession was not considered notice. In Newhall v. Pierce, 5 *Pick.* 459, it was held that the single fact of the grantor continuing in possession after the deed given by him had been recorded, was not sufficient ground to infer notice to a creditor of the existence of a bond of defeasance. See also Lafferty v. Krider, 1 *Whart.* 302.

The above mentioned cases in this court, while they recognize the general doctrine, show that knowledge of the possession has not the effect of visiting the purchaser with notice of every fact and circumstance which he might have learned by making inquiry of the possessor : and if we recur to first principles, it would seem that the utmost that could fairly be implied from the possession by another person than the grantor is, that such possessor has some claim or title to the land, and therefore the purchaser, generally speaking, is to be considered as taking subject to such claim or title. Knapp therefore remaining in possession, and Jaques agreeing with a knowledge of such possession to purchase from Crocheron, might perhaps be considered as having notice of the claim of Knapp as mortgagor by virtue of the defeasance. But I am not able to go the length of saying, that he thereby also had notice that such defeasance was not recorded, and therefore was a purchaser of an unrecorded mortgage. This it seems to me would be to heap construction on construction, to infer that there existed a defeasance, and also that such defeasance was not recorded ; whereas, in the absence of any actual notice, the

presumption would be, that Knapp, holding possession under a claim which the law required to be recorded to give it full validity and effect, had had it recorded according to law. The fact that it was not recorded was no notice of that fact to Jaques, because, as he did not know of its existence, he could not be expected to search for it.

I am therefore of opinion that at the utmost the effect would be, that Jaques bought the fee simple subject to the defeasance and liable to the equity of redemption, having a prior equity over any subsequent purchaser, and entitled on the case before us to recover the premises and hold them till he is paid the amount advanced by Crocheron to Knapp with interest, or the sum be paid to Crocheron if greater than that, with costs of suit.

As to the errors assigned on the other bills of exception they are not sustained.

KENNEDY, J.—There is nothing wrong in the first two matters assigned for error, which are bills of exception to the opinion of the court as to the admission and rejection of evidence. The evidence, as offered in the first bill, was properly admitted; and the evidence mentioned as offered in the second bill was rightly rejected. In the first bill of exception, the objection to the deed's being read in evidence was, that the probate thereof was not certified by the commissioner before whom it purported to have been made, under his hand and seal, as required by the act of assembly of the 14th of April 1828, authorising the governor of the state to appoint commissioners in our sister states for the purpose of taking the acknowledgements or probates of deeds, mortgages or other conveyances, &c., of lands lying within this state. If this were the only act relating to this point the objection would have been good, and ought to have prevailed; but there is a further supplement on the subject of acknowledging and recording of deeds, passed the 19th of February 1835, which enacts " that *all* acknowledgements or probates of deeds or other instruments of writing theretofore taken or made, or which shall thereafter be taken or made, shall be construed to have the same effect to all intents and purposes, although the same may have been certified by the *officers* before whom such acknowledgements or probates have been made under their hands only, as if the same had been certified under their hands and seals," &c. The letter, spirit and meaning of this latter act all embrace and provide for this case in the most clear and explicit terms; so that there cannot be a doubt of the deed, proved and certified as it is, being rendered thereby admissible in evidence. It was said that this latter act was only designed to extend to cases of deeds acknowledged or proved before *officers* residing *within the state*, because the term " officers," as it is contended, does not include *commissioners*. This distinction is too refined; indeed it is not well founded; and is certainly such as the legislature never thought of. For strictly and properly these commissioners are officers, and officers of the state too *pro hac vice*, be-

VII.—Y

cause they are employed and commissioned by the governor on behalf of the state, under his hand and the seal of the state, in the same manner as all officers of the state are, for the especial purpose of taking the acknowledgements or probates of deeds concerning lands lying within the state, whether the deeds have been executed within or without the state, in the same manner as the officers designated within the state for that purpose are authorized to do.    The act is universal in its terms, embracing "*all* acknowledgements or probates" taken or made before officers authorized to take the same, without regard to their location or residence, whether in or out of the state, that are certified under their hands, but not their seals.    And being likewise remedial in its character, it would be the duty of the court, even if the terms of it were doubtful in this respect, to give it such construction as would remedy the evil intended to be reached to the fullest extent that the words thereof would reasonably admit of.

The evidence offered, as stated in the *second bill of exception* and rejected by the court, was to prove that from 1830 to 1833 it was generally reported in the neighbourhood that John H. Knapp had sold out all his interest at that place (including the land in dispute) to Asbury Crocheron; and that the report was communicated to Weeks, one of the defendants.    The vague reports of persons not interested in the property are not to be regarded by a purchaser; nor are they sufficient to affect his conscience. And accordingly, in Wildgoose *v.* Weyland, *Gould.* 147, *pl.* 67, A, being seised of land in trust for the use of B, was about selling it, when one came to the person who proposed buying and told him to take heed how he bought the land, for A had nothing in it but upon trust to the use of B ; and then another came to the vendee and said to him, it is not true as he was informed, for A was seised of the land absolutely; upon which the vendee bought it; and though the information given by the first proved to be true, yet the purchaser was held not to have notice.    And the lord keeper said, "it was not sufficient notice of the trust; for flying reports are many times fables and not truth; and if it should be admitted for sufficient notice, then the inheritance of every man might easily be slandered."    So in Cornwallis's Case, *Toth.* 186, *tit. Trust* 164, where the conveyance was absolute on its face, but a trust in fact existed, and a rumour to that effect prevailed, which had come to the ears of the purchaser before he bought, yet he was held not to be concluded by it.    And in Tolland *v.* Standbridge, 3 *Ves.* 486, lord Alvanley, master of the rolls, thought it not sufficient to prove notice, that it had been asserted in the hearing of the purchaser, or that he had been told, that some other person claimed a title; and doubted very much whether a general claim was sufficient to affect him with notice of a deed of which he did not appear to have had knowledge.    See also *Sugd. on Vend., ch.* 17, *tit. Notice*, 729, 730.    The court below, therefore, were right, as it appears to me, in rejecting the evidence.

The next matter assigned for error raises the question whether

the deed of conveyance from John H. Knapp to Asbury Crocheron, taken in connexion with the deed of defeasance, be a mortgage or a defeasible purchase of the land. As between the parties thereto, I consider them a mortgage: First, because, being executed at the same time, in pursuance of one and the same agreement, they must be regarded as forming but *one* instrument *between the parties,* though they certainly make two distinct deeds; that is, the conveyance being the separate deed of the grantor, and the defeasance the deed of the grantee. Second, Because it appears from the face of the defeasance that the deed conveying the land from Knapp to Crocheron was made for the purpose of securing the repayment of the money therein mentioned, with interest, which is stated expressly to have been *lent* by Crocheron to Knapp. And third, Because there does not appear to have been any actual surrender of the possession of the land by Knapp to Crocheron; but Knapp, on the contrary, appears to have continued in the possession thereof afterwards as before, even after the time had elapsed when the money was to have been repaid. In support of the second of these reasons, Mr Butler, in his note to *Co. Lit.* 205, *a. note* (1), lays it down as a general rule, that wherever a conveyance or assignment of an estate is *originally intended* as a *security for money,* whether this intention appear from the deed itself or from *any other instrument,* it is always in equity considered as a mortgage, and the estate redeemable, even though there be an express agreement that it shall not be redeemable, or that the right of redemption shall be confined to a particular time or to a particular description of persons. This was considered and adopted as a general rule in Wilcox's Heirs *v.* Morris, 1 *Murph.* 117, and seems to be well sustained by the whole current of authorities on the subject. It is likewise in accordance with the maxim that once a mortgage always a mortgage; so that the *same* estate or interest cannot be a mortgage at one time, and at another cease to be so. See Newcomb *v.* Bonham, 1 *Vern.* 8. In this last case the lord chancellor said, " that the deeds of lease and release being but a *security,* the same could *not* be *extinguished* by any covenant or agreement entered into *at the time* of making the mortgage," *note* (1) *per Mr Raithby.* Accordingly, chancellor Kent, in Henry *v.* Davis & Clark, 7 *Johns. Ch. Rep.* 40, ruled that a conveyance of real estate, intended merely as a security for a debt, though absolute on the face of it, was a mortgage, and that any agreement made at the *same time,* on a subsequent event, to change the nature of it and prevent the equity of redemption, was void; and said that no principle in equity was better settled. See S. C., on appeal, 2 *Cowen* 332; also Slade *v.* Seton, 7 *Ves.* 273; *Fonb. Eq., lib.* 3, *ch.* 1, *sect.* 4. It cannot avail, therefore, and take the present case out of the general rule, which seems to be so firmly established in favour of the right of redemption and against the imposition of restrictions upon it, that by the terms of the deed it is the *defeasance* that is to become void and of no effect upon failure to pay the money, with the interest thereon, at or be-

fore the time appointed for that purpose, instead of declaring, as is more usual, perhaps, that upon payment of the money with the interest thereon, agreeably to the time mentioned, that the deed of *conveyance* should then be void and of no effect. The absence of a covenant for the payment of the money has also been urged to show that the parties intended the transaction to be a defeasible purchase and not a mortgage; but this is not sufficient, and was so held in Lawley *v.* Hooper, 3 *Atk.* 280, by lord Hardwicke, who said the objection was not well founded, for a covenant to repay the money was not necessary; all Welsh mortgages were without this covenant, and so were most copyhold mortgages. To which it may be added, that many, if not the most of the mortgages given in Pennsylvania are also without such covenant.

The next question which seems to arise out of the matters assigned for error is, may Jaques be considered a *bona fide* purchaser without notice, invested with the legal title to the land, and therefore entitled to recover? To his being so considered, though he may not have had actual notice that Crocheron, of whom he bought, was in reality only a mortgagee of the land and not the absolute owner, yet it may be objected that in equity he ought to be held affected with notice arising from Knapp's being in the actual possession and still continuing to occupy it at the time he purchased. The fact of Knapp's having remained in the possession after giving the mortgage until he left that section of the country in May 1833, it must be admitted, seems not to have been controverted; or at least, all the evidence, and there is not a little in this respect, goes to show without the slightest contradiction it was so. Every purchaser of land, I take it, as a general rule, must be presumed in equity to know whether the possession be vacant or not; and if a third person be in the actual and visible occupation of the land at the time of his purchase, it is sufficient to put him on inquiry, in order that he may know by what tenure or right such person holds the possession; and whatever is sufficient to put the party on inquiry is equivalent to notice in equity. Smith *v.* Lane, 1 *Atk.* 489, 490; S. C., *Rep. temp. Hardw. by West* 669. Indeed this has ever been considered, I believe, as the settled rule in equity. Correy *v.* Caseton, 4 *Binn.* 148; *Sugd. Vend.* (7*th Eng. Ed.*) 743, 744. Accordingly it was held in Daniels *v.* Davidson, 16 *Ves.* 249; 17 *Ves.* 433, that the possession of a tenant who had taken it under a lease for a term of years, and during the pendency of the lease made a contract with his lessor for the purchase of the reversion, was notice to a subsequent purchaser, the lease being still unexpired, not only of the tenant's interest under it, but likewise of his equitable title to the estate under his contract for the purchase of it. And again, in Allen *v.* Anthony, 1 *Meriv.* 282, it was ruled that the possession of the tenant was notice to the purchaser of the whole of the interest which the tenant actually had in the estate; and therefore of his right to the timber growing thereon, although such right accrued by a title posterior to that on which his possession was

[Jaques v. Weeks.]

grounded. Sir Thomas Plumer, master of the rolls, likewise, in Meux *v.* Maltby, 1 *Swanst.* 287, said that it had been repeatedly decided that the purchaser of an estate in possession of a tenant was bound to inquire by what right and under what agreement the tenant held it. See also Powell *v.* Dillon, 2 *Ball & Beatty* 220, and Chesterman *v.* Gardner, 5 *Johnson's Ch. Rep.* 33. These cases not only seem to show that in equity Jaques could not be considered as a *bona fide* purchaser without notice of Knapp's claim to the right of redemption in the land; but on the contrary that he must be taken to have known how the matter stood in this respect between Knapp and Crocheron, and that Knapp still held the possession of the land under the right to redeem. Still, however, it may be, and such is the inclination of my mind, that Knapp, under our recording acts, if he were the defendant in the ejectment, could not avail himself of such equitable ground of notice as against Jaques, who must be regarded as having no notice either in fact or in law of Knapp's right to redeem, seeing the latter had it in his power, by putting his defeasance on record, to have given Jaques notice *in law* of his right to redeem. This being the case, Knapp, by withholding his defeasance from record, thus neglected to give what would have been notice *in law* of his right to redeem. Would it be just or equitable then to permit him to take advantage of such neglect? And would not permitting him to set up the defeasance here, for the purpose of defeating the purchase of Jaques, be in effect allowing him to practise a palpable fraud upon Jaques? Under our recording acts, no instrument of writing or deed of any kind can be recorded before the execution of it has been completed. The defeasance in this case, therefore, could not be recorded before the delivery of it to Knapp, which was essentially necessary to the completion of its execution; but Knapp by its being delivered to him became entitled to the possession of it, and therefore the only person who could have it recorded: so that it was not in the power of Crocheron or Jaques, or that of any other person, except Knapp, to have it recorded. Why then should Crocheron or Jaques, in whom there has been no default in this respect, lose by the neglect or omission of Knapp; and he be permitted to derive an advantage from it; or what is worse, to claim and receive a benefit from his own wrong or dishonest conduct, by taking away from Crocheron or Jaques, without rendering them any thing whatever for it, what he had previously granted to the first upon receiving from him a valuable consideration for it. I am now speaking of a defeasance that is reduced to writing, and capable of being recorded by the party holding it; for if it be made merely by word of mouth, the grantor would, as it appears to me, be entitled to insist upon his possession, as being notice in equity, of his right to redeem, to the vendee of his grantee; because having nothing that he could record, to show his right, he could not be said to be in fault. So if his grantee has had the deed of conveyance from him recorded, which is absolute on its face, he has done, in my humble opinion, all that the legisla-

ture has required he should, in order to render it available to all
intents and purposes under the recording acts, because it is all
that he could do; and therefore no blame ought to be attached to
him.   *Lex neminem cogit ad vana seu impossibilia.*   If Knapp himself,
then, ought to be precluded from claiming protection under the shield
of such equitable notice, it would seem to follow that those who be-
came purchasers from him, or of what might have been thought to
be his rights, after Jaques had purchased, can be in no better con-
dition than Knapp himself.   But be this as it may, and admitting
that Jaques cannot be considered in equity as the purchaser of the
absolute estate in the land without notice, and therefore entitled as
such to recover, what is there to prevent him from recovering it at
law as the assignee of the legal title?   It is settled that a mortgage
in fee may be assigned by the mortgagee or even by his personal
representatives after his death, and that the assignee of either may
maintain ejectment in his own name to recover the possession of the
mortgaged premises.   Simpson *v.* Ammons, 1 *Binn.* 176 ; Smith *v.*
Shaler, 12 *Serg. & Rawle* 243.   The deed of conveyance from Cro-
cheron to Jaques may not only be considered an assignment of the
mortgage, but in law an absolute transfer of the estate in fee to the
latter ; and it is obvious that the parties intended it should be so.

But it has been objected, that as the deed of defeasance was not
recorded, the deed of conveyance from Knapp to Crocheron must,
notwithstanding it was recorded within the six months, be consider-
ed as an unrecorded mortgage according to the decision of this
court in Friedly *v.* Hamilton, 17 *Serg. & Rawle* 70, and therefore no
*interest* or *estate* in the land passed to Crocheron.   It is contended also,
that this is in conformity to the act of 1715, which enacts, among
other things, that " no deed or mortgage or defeasible deed, in
the nature of mortgages, thereafter to be made, shall be *good* or
*sufficient* to *convey* or *pass* any *freehold* or *inheritance*, or to *grant* any
*estate* therein for *life* or *years*, unless such deed be acknowledged or
proved and *recorded within six months after the date thereof*, where such
lands lie, as therein directed for other deeds."   This objection has
been met, first, by the argument that the deed of conveyance to
Crocheron was absolute on its face, and was to be taken and received
as such by third persons at least, unless Knapp, who held the deed
of defeasance, choose to record it also.   That it was at his election,
either to make the deed given to Crocheron an absolute conveyance,
or defeasible, as he pleased, by placing or omitting to place the deed
of defeasance upon record : that if he did not record it, he might be
the sufferer himself by putting it in the power of Crocheron to dis-
pose of the land absolutely ; but that nobody else could be injured
by his omission to record it.   This argument certainly carries with
it great force, if not conviction; and I am far from being satisfied
that such a transaction has not been generally looked at in this point
of view ; and not as one tending to delay, hinder or defraud credi-
tors.   For the mortgagor having consented, as it were, by omitting to

record the defeasance, that the mortgagee shall appear to the world to be the absolute owner of the land, cannot be supposed to have gained, or that he will gain credit, on the faith of his being any longer the owner of it. And if he has not mortgaged the land for its full value, it is not to be presumed that he would attempt to delay or to defraud those to whom he may be indebted at the time of making the mortgage, when, by doing so, he may be in danger not only of losing his interest in the land, but of being compelled to pay his debts beside. If however the mortgage be given for the value of the land, it is self-evident, then, that no one can lose by the mortgagee's assuming to be the absolute owner of the land, and as such undertaking to dispose of it. If fraud however be intended by the parties, and the mode of having two deeds, the one an absolute deed of conveyance and the other a deed of defeasance, is adopted with a view the more effectually to hinder, delay or defraud the creditors of the grantor or mortgagor, the arrangement would be void as against them, whether recorded wholly, partially, or not at all. But this form of making a mortgage *per se*, I believe, has never been pronounced exceptionable, even as being more injurious to the interests of creditors than that of any other; though as being so to that of the mortgagor, it has. Lord Talbot thought so in Cotteral *v.* Purchase, *Ca. temp. Talb.* 63, when he said, " I think it is a very wrong way : and to me, it will always appear with the face of fraud ; for the *defeasance* may be *lost*, and the *absolute conveyance* is set up. I would discourage the practice as much as possible." It is manifest that the fraud, here spoken of by the chancellor, is that which the mortgagee might be enabled to practise upon the mortgagor by the loss of the defeasance. And for this reason alone, Lord Hardwicke seemed to think it somewhat exceptionable in Baker *v.* Wind, 1 *Ves.* 160, where the clause of redemption was not inserted in the deed of conveyance, but in a separate deed, because the mortgagor was willing that, on *account of his creditors*, the transaction should appear to be an absolute sale; for the lord chancellor merely says, " whenever the court found the clause of redemption in a separate deed, it would adhere strictly to it, to prevent the equity of redemption from being entangled to the *prejudice of the mortgagor*," without saying a word as to the creditors, though the mortgagor took the defeasance in a separate deed for the very purpose of deceiving his creditors. But the same objection does not arise in Pennsylvania to the defeasance, as being in a separate deed, because the mortgagor may protect himself, by putting it on record as directed by our recording acts, against all possible injury that otherwise might arise from the loss of it. The argument of the plaintiff's counsel here has also, to a certain extent, the support of the late Chief Justice Parker of Massachusetts, who lays it down in Harris *v.* The Trustees of Phillips Academy, 12 *Mass. Rep.* 464, that "non registry of a defeasance operates to make the estate, which was really between the parties conditional, *absolute against every body* but the *original* parties and their heirs." And if he meant

every body without *actual* notice, as I presume he did, it appears to me, that the proposition is perfectly correct, not only at law but in equity.   And as to the fraudulent use that may be made of such form of pledging real estate as against the rights of creditors, he says, "Holden (the mortgagor) might have kept his defeasance secret for a time, with a view to prevent his creditors from levying on the estate, but unless Harrison (the mortgagee) colluded with him for this purpose, and agreed that the defeasance should not be put upon record, the fraud, if any, was Holden's, not Harrison's."

It may possibly, however, be thought by some, that this doctrine is repugnant to the rule, that once a mortgage always a mortgage: but the rule being properly understood, it is clear that the parties are not precluded by it from making subsequently a new agreement for the absolute sale of the estate, and by this means turning the mortgagee into an absolute purchaser of it.   The rule only prevents the parties from making any agreement or device contemporaneously with the execution of the mortgage, whereby it shall upon any subsequent event be turned from a mortgage into an absolute purchase of the estate.   But it never has been extended, so as to prevent the mortgagor from agreeing subsequently to release his equity of redemption in consideration of his being released from the payment of the mortgage, debt and interest, and from carrying the same into effect.   Nor can it be said with propriety that the rule, thus understood, would seem to protect the mortgagor in his right to redeem, when he has it in his power to put the evidence of it upon record, so that the public may become acquainted with it, but refuses or neglects to do so ; and thus impliedly consents that the mortgagee shall be considered the absolute owner of the estate.   Such conduct may well be held to be equivalent to a subsequent agreement on the part of the mortgagor, that the mortgagee shall be regarded by third persons as the absolute owner of the estate ; and that he is willing to release his right of redemption, in case the mortgagee should make sale of it.   Or in the event of such sale being made, may not the mortgagor, who withholds his deed of defeasance from record, be looked upon as the owner of an estate, who, knowing his right, stands by and witnesses another selling it for a valuable consideration, without making known his right or objecting to the sale, be considered as bound and concluded by it; inasmuch as it would be against all conscience and every principle of honesty to permit him to assert his right afterwards against a *bona fide* purchaser of it ?

Under this view then, there being no evidence tending to prove that Jaques had *notice in fact* at the time he bought, he must be deemed a *bona fide* purchaser of the absolute estate in fee as also of the legal title, and cannot therefore, as the late Mr Justice Duncan says, in Peebles *v.* Reading, 8 *Serg. & Rawle* 496, be affected by any latent equity of which he has not had *actual notice*, or which does not appear on the *same deed necessary* to the *deduction* of his title ; for which he cites 1 *Wash.* 4.

[Jaques v. Weeks.]

But the objection of the defendant's counsel has been met by a second argument, which seems to be sustained by authority at least: and that is this, that as between the parties and those claiming under them with notice of the real character of the transaction, that is, of its being a mortgage, an interest or estate does pass, notwithstanding it has not been recorded in conformity to the act of 1715. That part of the act relating to this point has been recited above ; and it is perfectly clear that the language of it has been borrowed from that of 27 Hen. 8, c. 16, requiring bargains and sales to be enrolled. By this statute, it is enacted, that "no manors, lands, tenements or other hereditaments, shall *pass, alter* or *change from one to another,* whereby any *estate* of *inheritance* or *freehold* shall be *made* or *take effect* in *any person* or *persons,* &c., by reason only of any bargain and sale thereof, except the same bargain and sale be made by writing indented, sealed and *enrolled* in one of the king's courts of record at Westminster, or else within the same county or counties, where the same manors, lands or tenements so bargained and sold lie or be, &c., *within six months* next after the date of the same writings indented, &c." Now in Le Neve *v.* Le Neve, 3 *Atk.* 652, lord Hardwicke says, the construction of this statute has ever been, that " if a subsequent bargainee has notice of a prior, he is equally affected with that notice, as if the prior purchase had been a conveyance by *feoffment* and *livery,* &c. ;" which mode of conveyance, it may be remarked, passes the estate perhaps with more effect than any other. *Shep. Touch.* 203, 204. And in speaking of this statute and the statute of 7 Anne, c. 20, which requires a memorial of all deeds and conveyances and wills made of or concerning lands to be registered, otherwise they shall be adjudged fraudulent and *void* against any subsequent purchaser or mortgagee for valuable consideration, the object of which as avowed in the preamble was to protect purchasers and mortgagees against *prior* and *secret conveyances* and *fraudulent incumbrances,* lord Hardwicke says, that " the *operation* of *both acts* and the *construction of them are the same,* and it would be a most mischievous thing, if a person, taking the *advantage of the legal form* appointed by the act of parliament, might under that protect himself *against a person* who had a *prior equity* of which he had *notice.*" S. C., 1 *Ves.* 66, 67.

As the great object of the statute of enrolments was to protect subsequent purchasers and mortgagees for valuable consideration against prior and *secret* conveyances or incumbrances, it was never held according to the letter of the statute that *no* interest or estate *passed* where the deed was not *enrolled* in conformity to the statute, except as against those who appeared to have had no notice anterior to their buying or taking a mortgage; because if it should appear that they had had such notice in any way, it *is evident that the* prior conveyance or incumbrance with respect to them could not be considered *secret,* and therefore, although they came within the letter of the statute, yet they could not be said to come within the equity or reason of it. And accordingly, in Paul *v.* Mitchell, *Toth.* 55, *tit.*

*Deeds,* a deed not enrolled was decreed good against the heir of the grantor. And in Forbes *v.* Denniston, 1 *Ves.* 67; S. C., 2 *Bro. P. C., first ed.,* 425, a prior lessee, who had neglected to register his lease, was protected against a subsequent purchaser of the estate with notice to his agent who negotiated the purchase. Also in Blades *v.* Blades, 1 *Equity Ca. Abr.* 385, *pl.* 12, lord chancellor King decreed that a subsequent registered deed with notice was not good against a prior unregistered deed; declaring at the same time, " that the subsequent purchaser, having notice of the first purchase, was bound by it, though not registered, and that his *getting his own purchase first registered was a fraud;* the design of those acts being only to give parties notice, who might otherwise, without such registry, be in danger of being imposed on by a prior purchase or mortgage, which they are in no danger of, when they have notice thereof in *any manner,* though not registered." And again lord Northington, in Sheldon *v.* Cox, 2 *Eden* 224, held that a prior unregistered mortgage was good against subsequent mortgagees with notice thereof to their agent. See also Chevel *v.* Nichols, 2 *Stran.* 664, to the same effect. And in the case of Chandos *v.* Brownlow, 2 *Ridgw. P. C.* 428, it is said by the lord chancellor, that every case upon the registry acts, both in England and Ireland, which had been brought before a court of equity, had been determined on the ground that those *acts did not affect the great fundamental principles of equity;* but that *every purchaser* claiming under a *registered deed* is left *open to any equity* which a *prior purchaser or incumbrancer may have.*

The same rule of construction and principles of equity have also obtained in regard to the statute of 4 and 5 W. & M., c. 20, sect. 3, which enacts that "no judgment not docketed and entered in the books directed to be provided and kept for that purpose, shall affect any lands or tenements, as to purchasers or mortgagees." The settled doctrine in equity upon the effect of notice is not considered as altered by this act more than by others; and hence in Thomas *v.* Pladwell, 2 *Eq. Ca. Abr.* 599, *pl.* 25, lord Macclesfield decreed that the purchaser of land with notice of a judgment obtained against the vendor before sale, should pay it, though not docketed and entered till three years after the purchase, because he was concluded by the previous notice of it. So lord Eldon, after great consideration, in Davis *v.* Strathmore, 16 *Ves.* 419, held that the purchaser of land was bound by notice of a judgment, though not docketed. And he said "he found from some notes, that having formerly consulted lord Thurlow, Mr Maddock and Mr Lloyd upon the point, they all conceived that *any notice* is sufficient by analogy to the case of the registry act; and lord Redesdale is clearly of the same opinion." Nor is it necessary that the purchaser should be informed of the precise nature or character of the lien or incumbrance in order to affect him with notice; for in Taylor *v.* Baker, 5 *Price* 306; S. C., 2 *Cond. Eng. Excheq. Rep.* 247; *Daniel's Rep.* 71, it was ruled that if a purchaser was informed that there were any pre-

vious claims on the vendor that would be a lien on the land before payment of the purchase money, it was sufficient notice to put him on inquiry : and if the lien turned out to be a mortgage instead of a judgment as it was told to him, it would be sufficient to affect him with notice.

Now it cannot be doubted but the same reason which induced the enactment of the statute of enrolments and the registry act of Anne, caused the introduction of the provision already recited in our act of 1715. The great object of it certainly was to protect subsequent purchasers and mortgagees of lands for valuable consideration, from being deceived and injured by *prior secret* incumbrances, created by mortgages or defeasible deeds. Therefore all such deeds were required to be put on record, so that any one about to purchase an interest in the land, or to take it as a security for the payment of money or other purpose, might, upon recourse to the proper office where such deeds were to be recorded, be informed whether there were any such or not previously given thereon. Deeds founded upon absolute sales of land were never considered as embraced within the provision recited above ; Burke *v.* Allen, 3 *Yeates* 355 ; Geiss *v.* Odenheimer, 4 *Yeates* 279 ; and most probably the reason was, because a corresponding change of the possession either accompanied or preceded the execution of such deeds of sale, which was not the case in respect to mortgages or defeasible deeds ; and therefore it may have been thought there was not the same occasion for including deeds of absolute conveyance. No provision of the kind was made in regard to them until the act of 1775 was passed, which is very similar in its general bearing, as to deeds, to the registry act of 7 Anne, c. 20. It is therefore fair to presume that the legislature in 1715, or at least the framers of the act of that date, were acquainted with both the terms of, and the construction which had been given to, the statute of enrolments ; and having used language nearly of the same import with that of the statute, it is therefore reasonable to conclude that in its intended that in its operation and effect it should be the same. This would seem to be the more certain, as well as reasonable, when we consider that the great object to be obtained was the same. Such would also seem to have been the opinion of the supreme court of this state according to the report of the earliest decisions we have on the subject In Levinz *v.* Will, 1 *Dall.* 453, a mortgage not recorded within the six months, as required by the act, was held, notwithstanding, to be *good* against the mortgagor. Chief Justice M'Kean, in delivering the opinion of the court in that case, says, page 456, " that the deed so far is *sufficient to pass the lands*, and that under it the possession of the premises might have been *recovered in an ejectment*." He also in the preceding page declares, that " the *original intent* of the makers of this law and their *principal reason* seem to have been to prevent honest purchasers or mortgagees of real estates from being deceived by *prior secret* conveyances or incumbrances; and therefore, to prevent this as far as

practicable, they directed that such conveyances or incumbrances should be recorded in the recorder's office of the proper county, so that any one might ascertain the liens upon the property which he wished to purchase or to receive as a pledge; making the record thereof constructive notice to all, and superseding express personal notice. But the legislature *did not mean, nor have they in fact enacted, that express personal notice, when given, should have no effect;* neither could they have entertained the idea of defeating fair and honest bargains, which do not injure other persons." Accordingly, in Parker v. Wood, 1 *Dall.* 459, where a mortgage having been acknowledged before and recorded by officers whose commissions had become *void* by the declaration of independence, it was *held* to be good against a subsequent judgment creditor and purchaser under a sheriff's sale who had notice of the mortgage. And in Stroud v. Lockhart, 4 *Dall.* 153, an unrecorded mortgage was adjudged good against a subsequent purchaser of the land from the mortgagor with notice. The court said the case was too plain for controversy. Down then to 1821 I am not aware of even a *dictum* having fallen from the bench that would seem to militate against this doctrine. In that year, however, it was ruled in Semple v. Burd, 7 *Serg. & Rawle* 286, that a prior unrecorded mortgage was not good against a subsequent judgment; but there it did not appear that the judgment creditor had notice of the mortgage when he obtained his judgment. This however, it must be confessed, does not appear to have been the ground of the decision. Again, in Friedly v. Hamilton, 17 *Serg. & Rawle* 70, the same point was adjudged, that a subsequent judgment was good against a prior unrecorded mortgage. Neither was any question of notice made in this latter case. But it is very clear, that the act of 1715 does not declare that a mortgage not recorded within the six months, shall be *void* against subsequent judgments, or even that it shall be *postponed* to them, though this may be the effect of the act of the 28th of March 1820, where the defeasance appears upon the face of the deed of conveyance itself.

It may be further observed, that the act of 1775, which declares that "all deeds and conveyances" made after the passage of the act and not proved and recorded in the proper office within six months after the execution thereof, "shall be adjudged fraudulent and void against any subsequent *purchaser* or *mortgagee* for valuable consideration," is a supplement to the act of 1715. But this act of 1775 has been held not to extend to subsequent *judgment creditors*; and that a deed of conveyance, though not recorded within the six months, is good against subsequent judgments; Rogers v. Gibson, 4 *Yeates* 111; Heister v. Fortner, 2 *Binn.* 40. And the late chief justice, in Geiss v. Odenheimer, 4 *Yeates* 279, in speaking of the act of 1715 and its supplement of 1775, says, "the supplement has varied the expressions, but *furnishes a strong legislative exposition of the former act.*" Yet it would seem as if the legislature of 1783 might have thought that the recording of a mortgage or defeasible deed within six months

[Jaques v. Weeks.]

was necessary to give it a preference to a subsequent judgment; for by an act of that year giving efficacy to mortgages and defeasible deeds made between the 1st of January 1776 and the 18th of June 1778, and not recorded in conformity to the act of 1715, they provided that "nothing therein contained should extend to or be deemed or construed to operate against any subsequent judgment, statute, recognizance, &c." But this provision may be regarded as having been introduced from abundant caution, and not from any settled construction of the act at that day which postponed an unrecorded mortgage or defeasible deed to a subsequent judgment; for all the adjudications on the subject, referred to above, were made after that time, which seem to indicate a different opinion where notice existed.

Having shown, I think most clearly, that an estate passed in the land and became vested in Crocheron under the deed from Knapp to him, notwithstanding the deed of defeasance was not recorded; and also, that the deed on its face being an absolute conveyance of the land in fee, was to be regarded as such by every one not having actual notice of the transaction upon which the deed was founded, excepting the parties and their heirs; it is proper to remark, in order to prevent misapprehension, that a third person acquiring a right by purchase under the absolute deed, the defeasible deed not being recorded, can only be affected in equity by notice. For at law he must be considered the absolute owner of the estate purchased by him, so far as it shall appear on the face of the absolute deed to have been vested in his vendor by the former owner thereof. This then would make Jaques the owner of the land in fee under the deed of conveyance to him from Crocheron. And the deed from Knapp to Crocheron forming a necessary link in Jaques's chain of title, must be considered an absolute deed of conveyance, and as such, coming within the provisions of the recording acts; and the record thereof be looked upon as constructive notice to all the world. The correctness of this proposition may, perhaps, be rendered more strikingly obvious, by supposing that the possession of the land had been vacant at the time Jaques purchased; and having bought it of Crocheron without actual notice of Knapp's right to the equity of redemption, he had put his deed from Crocheron immediately upon record: can it be doubted that the record of the deed from Knapp to Crocheron, and the record of the deed again from Crocheron to Jaques, would not have been constructive notice under the provisions of our recording acts to Weeks, as well as every body else, subsequently buying the land either of Knapp, or at sheriff's sale as his estate, under a judgment obtained against him after the execution of the deed by Crocheron to Jaques? That it should have this operation is not only consistent with the true spirit and meaning of the recording acts, but necessary, as it appears to me, in order to guard against and to prevent the identical, and even more outrageous frauds from being committed, than those which induced the passage of them. But it is more, it is also consistent with the original agreement and

VII.—Z

[Jaques v. Weeks.]

subsequent conduct of the parties. For, by their original agreement and subsequent acts, it is either made absolute or defeasible, and may be presented to the public in either form ; or it may be done in such manner as to leave it in the power and at the election of the grantor to have it given to the public in either form as he pleases. This is what may be said to have been done in this case ; because, by the agreement of the parties, Crocheron had an absolute deed of conveyance of the land in fee from Knapp, and the latter took from the former a deed of defeasance thereto. The latter, having possession and exclusive control of the deed of defeasance, had it altogether in his power to make the transaction appear on record, either as an absolute sale or as a mortgage of the land, just as he pleased. Crocheron could only put the deed in his possession, which was absolute, on record ; but this, without the defeasance being placed there also, would appear to, and must be regarded by the public as an absolute conveyance of the fee simple. And whether the absolute deed were recorded or not, the recording of the defeasance alone would be sufficient to show the public that it was not to be regarded as absolute. Thus it appears that the party holding the defeasance has it completely in his power to make the conveyance of the land appear to the public eye defeasible or absolute as he pleases. And certainly his right to do so ought not to be questioned, *cujus est dare, ejus est disponere.* It may therefore be said with great propriety, that if the grantor withholds his defeasance from record, he is willing that the transaction should not only appear to, but be considered by, the the public as an absolute sale.

It has been said before that Knapp had it in his power, whether Crocheron put the absolute deed on record or not, by recording the defeasance, to have protected himself in his right to the equity of redemption to the utmost extent both in law and equity. It is too plain to admit of a question, that if the defeasance had been recorded without the absolute deed's being so, it would have been constructive notice under our recording acts, even had the land been vacant and unoccupied, to all the world, that the absolute deed was intended to be a mortgage between the parties. If it were to be held otherwise, it is clear that it would be putting it in the power of the grantee to cheat the grantor out of his right of redemption, by selling the land to an innocent stranger for a valuable consideration, without putting his deed on record at all. If it be right and consonant to the letter and spirit of the recording acts, that the recording of the defeasance should operate thus in favour of the grantor, why then, upon principles of reciprocity and equal justice, shall the grantee and his assignees, claiming under the absolute deed, not be protected, by putting it on record, against the grantor's fraudulently withholding the defeasance from record ? There is no reason, and certainly it never could have been intended by the legislature, that the parties should not be placed upon an equal footing with each other in this respect, and prevented, as far as practicable, from defrauding each

[Jaques v. Weeks.]

other. If this be not the proper construction of the recording acts in regard to mortgages and defeasible deeds, a deed absolute on its face conveying land, but made subject to a verbal defeasance, must be little, if any better than a nullity; because, from the very nature of such a defeasance, it is impossible to have it recorded as required : but such defeasance has been held to be perfectly good and operative, so as to render the absolute deed a mortgage only in equity as between the parties. Kemble *v.* Wolfersberger, 6 *Watts* 126. And in that case, where the plaintiff in ejectment claimed the property as a purchaser at a sale made thereof by the sheriff under a judgment obtained against the mortgagor after he had given the mortgage, it never was supposed or imagined by the plaintiff, or his counsel either, that he could recover the possession from the defendant, who was the mortgagee, and had taken it under his deed, which was an absolute conveyance on its face, but held to be a mortgage, according to a verbal agreement of defeasance made between the parties at the time of its execution, without first tendering or paying to the defendant the whole of the mortgage debt. But if the defendant here be entitled to hold the property without paying, or at least tendering to the plaintiff the amount of the mortgage money with the interest due thereon, the plaintiff in the case last cited was entitled to recover the property there, without paying or tendering the mortgage money as he did. According to the decision there, it being settled that a verbal or parol defeasance is as effectual, when established, as if it were by deed, it follows that the defeasance need not be recorded ; for being verbal only, it cannot; neither can it be requisite under the recording acts, because the deed of conveyance is entire without it ; and it cannot be said to form any part of the deed conveying the estate, because a parol agreement, being of a lower grade in law than a deed, cannot be considered as forming properly a part of it, though the deed is rendered defeasible by the parol agreement ; so that the party holding the deed of conveyance, when it was separated from the defeasance, must, by getting it, alone, recorded, be considered as having placed the whole of his deed on record, and done all that the recording acts required of him. The defeasance, when separated from the deed of conveyance, whether it be by deed or parol, cannot legally be considered as forming any part of the deed of conveyance, though having a relation to it so as to render it defeasible; otherwise a verbal defeasance would be of no avail, and would be regarded as a mere nullity under the operation and the construction contended for of the recording acts; because, from its very nature, it is impossible that it can be recorded as thereby required. But, according to Kemble *v.* Wolfersberger, a verbal defeasance is not only good as between the original parties, but between the mortgagee and a purchaser of the mortgaged estate at a sheriff's sale made under a judgment obtained against the mortgagor subsequently to his giving the mortgage. This view of the recording acts, as it appears to me, seems to meet fully all that the legislature could reasonably have

[Jaques v. Weeks.]

intended, by requiring that a " deed or mortgage, or defeasible deed in the nature of mortgages," should be recorded. The grantee, by getting his deed recorded, whether it appears on its face to be defeasible or not, has procured the whole of it to be recorded, and all, as has been already shown, that he had any control over. And having done this, he has put it out of the power of the grantor thereafter to deceive or defraud others by making a subsequent sale or mortgage of the same estate ; or to obtain a false credit with the world on the ground of his still being the owner of it; and this I apprehend was all that the legislature designed to prevent by the act of 1715 ; and it must be admitted, according to all the decisions we have on the subject, to be all that was intended by the act of 1775 relative to absolute deeds of conveyance of real estate.

But if it be true, as contended on behalf of the defendants, that all subsequent incumbrances or conveyances created, suffered or executed by the grantor on or of the land, shall avail against the grantee, whose deed was made subject to a verbal defeasance, notwithstanding his deed has been recorded in due form, or the party taking the subsequent incumbrance or conveyance may have had previous actual notice of its existence; then it is obvious that, under such a construction of the recording acts, the most barefaced and outrageous acts of fraud will not only be committed but encouraged, because thereby they will be protected when committed. The consequences will be the same, also, and no less alarming, though the defeasance be by deed or in writing, but separate from the conveyance; for the grantor, who alone has it in his power to have it recorded, by withholding it from record, may go on to exercise the same power or right of ownership over the land, and those with whom he deals in respect to it may claim the same privileges and benefits therefrom that they would have been entitled to, in case the defeasance had been verbal merely. Suppose, for instance, the owner of an estate were to borrow upon it 10,000 dollars, a sum equal to its worth, and to execute an absolute deed of conveyance to the lender, in order to secure the repayment of the money, accompanied by a verbal agreement of defeasance, or a written one upon a separate paper; and a third person, present as a witness to the whole transaction, in a day or two thereafter, were to purchase the estate of the grantor at 300 or 400 dollars paid in hand, and the grantor, after making a deed of conveyance to this purchaser, were to abscond and quit the country; would not every one in the community join in pronouncing it against all conscience, as well as every principle of common honesty, in the purchaser of the estate, after the money lent upon it had become payable, to attempt to hold the estate from the lender of the money without paying the amount thereof? It is plain that it would be a fraud so gross and naked that no person possessed of any one of the common senses could have it presented to him without discovering it. Is it possible, then, that the legislature could ever have intended to encourage and fur-

[Jaques v. Weeks.]

nish a protection to such conduct? Yet the case now before us is substantially the same with the one supposed. To decide that the defendants are entitled to hold the land in controversy would be to set aside the great fundamental principles of equity and natural justice, and to declare that every subsequent incumbrancer or purchaser claiming under a recorded deed is left open to no equity whatever which a prior purchaser or incumbrancer may have. Nothing but the most positive enactment by the legislature, in terms that are incapable of any other construction, would seem sufficient to warrant such a conclusion.

Considering the deed, then, from John H. Knapp to Asbury Crocheron in the light of an absolute conveyance of the land in fee, as between the parties here, and that, at most, it is only in equity, or upon equitable principles, that the defendants can claim to have any interest at all therein; and seeing that the plaintiff has become invested with the legal title to the land, and with a right at law, founded not only upon a prior but much stronger equity than that of the defendants, if the amount of consideration paid by them respectively is to be regarded as increasing their equities; it follows, then, that the defendants can have no pretence for withholding the possession of the land from the plaintiff without satisfying and paying him the amount of the money advanced, with interest thereon, by Crocheron to Knapp, or that advanced by himself on the purchase to Crocheron, if it be greater than the first, together with the costs of this action.

Judging from the evidence, it would seem probable, if not certain, that the defendants placed themselves in their present situation with their eyes open and a full knowledge of the plaintiff's claim to the land, and all the circumstances attending it. But be this as it may, since the deed of conveyance from Knapp to Crocheron was put on record, and as Jaques after this bought the fee simple estate in the land from Crocheron for a valuable consideration, without any actual notice of Knapp's right to redeem, which the latter kept a secret by withholding his deed of defeasance from record, and had his deed of conveyance from Crocheron also recorded long before the judgment was obtained against Knapp under which the sheriff sold the land, and likewise before Weeks bought it of Knapp, that Weeks and Saynisch, and those under whom they claim, were bound to take notice of the plaintiff's right or title. It being placed on record in the recorder's office of the proper county was constructive notice to them at least, which is sufficient to prevent their claiming to be purchasers of the land without notice.

The court below therefore erred in directing the jury that the plaintiff's title being on record was no notice of it in law to the defendants; and likewise, if I apprehend the court rightly, in telling them that no *estate* or *interest passed* under the deed of conveyance made by Knapp to Crocheron.

Judgment reversed, and a *venire de novo* awarded.