**In re EXECUTIVE HOUSE ASSOCIATES, a Pennsylvania Limited Partnership, Debtor.**

**Bankruptcy No. 88–10214F.**

United States Bankruptcy Court, E.D. Pennsylvania.

April 20, 1989.

Kenneth Aaron, Mesirov, Gelman, Jaffe, Cramer & Jamieson, Philadelphia, Pa., for the debtor, Executive House Associates.

Lois Davis, Asst. U.S. Atty., Philadelphia, Pa., for Dept. of Housing and Urban Development (HUD).

James J. O'Connell, Philadelphia, Pa., Assistant U.S. trustee.

Michael L. Temin and Wolf, Block, Schorr and Solis–Cohen, Philadelphia, Pa., Sp. Counsel for HUD.

## OPINION

BRUCE I. FOX, Bankruptcy Judge:

The debtor and a purported secured creditor, the United States Department of Housing and Urban Development (HUD), have raised a number of interesting questions for resolution. The debtor is a Pennsylvania limited partnership, which owns but one significant asset—a residential apartment building known as Executive House, located at 6100 City Line Avenue, Philadelphia, Pa. HUD asserts a security interest in both the real estate and the rents accrued therefrom. Prior to the debtor's filing its voluntary petition in chapter 11, HUD had scheduled this property for non-judicial foreclosure sale.

The essence of this dispute is that HUD would like to resume foreclosure while the debtor believes that HUD will be paid that which the bankruptcy code entitles it to receive in the context of a chapter 11 plan. By agreement, though, these parties have narrowed their immediate dispute to the following three questions: whether HUD holds a valid security interest in the real estate and its rents; what the fair market value of the real estate was as of May 1, 1988; and whether HUD is entitled to relief from the automatic stay pursuant to 11 U.S.C. § 362(d). [N.T. at 111–13, 12/2/88.]

The question of greatest importance is whether HUD holds a secured claim. If not, then it has offered no basis for obtaining relief from the stay and the debtor's ability to reorganize is easily demonstrated. If HUD is a secured creditor, the valuation question relates to the size of HUD's allowed secured claim, 11 U.S.C. § 506(a), and whether the debtor can propose a viable reorganization plan and adequately protect HUD's interest.

I.

After a four day trial, I make the following factual findings:

1. The debtor, Executive House Associates, is a Pennsylvania limited partnership with two general partners, Jack W. Blumenfeld and Alan Feingold, along with approximately 90 limited partners. In addition, there is one "special" limited partner.

2. On August 3, 1982, the debtor purchased the land located at 6100 City Line Avenue, Philadelphia, Pa., from Executive Towers, Inc.

3. On August 3, 1982, the debtor signed a note and mortgage agreement in favor of VNB Mortgage Corporation in the principal sum of $18,434,500.00.

4. The deed and mortgage were left for recordation with the Philadelphia Recorder of Deeds on August 3, 1982. Both were duly recorded, with the mortgage recorded at EFP No. 466 pp. 241 *et seq.* (Recorded with the mortgage was a Regulatory Agreement for Multi–Family Housing Projects, Ex. G–J.)

5. The mortgage and note were assigned by VNB Mortgage Corp. to the Pennsylvania Housing Finance Agency, then to Sovran Mortgage Corp., then to Government National Mortgage Association, and finally to HUD. Each assignment was duly recorded with the Philadelphia Recorder of Deeds.

6. After purchasing the land, the debtor began construction of a residential apartment building called Executive House. The building was finished in 1985 and contains 301 apartments ranging in size from one to four bedroom units. There are 286,-703 square feet of rentable space plus a large parking garage for tenants.

7. Under the terms of the note and mortgage, beginning in September 1982 the debtor was to pay only monthly payments of interest at a rate of 11.479%. Beginning in May 1985, monthly principal and interest

payments of $166,350.55 were to be made for a period of five years. These payments were to be followed by monthly payments of $146,975.39 until the entire principal balance was paid. Interest was to accrue at the rate of 9.75% beginning in approximately May 1985, and all payments were to be made not later than 40 years after May 1, 1985. (Ex. G–A, G–B.)

8. The debtor tendered all required payments until September 1, 1985. Thereafter, through December 1987, only a few payments were made to the mortgagee, totaling approximately $600,000.00. No payments were made by the debtor in 1987 and 1988.

9. A notice of default was sent to the debtor in October 1985. The loan balance was accelerated in February 1987. A notice was sent to the debtor in November 1987, demanding that all rental payments received by the debtor be turned over to HUD.

10. Between September 1985 and December 1987, Jack W. Blumfeld, one of the debtor's general partners, loaned in excess of $3,000,000.00 to the debtor. [N.T. at 94, 11/9/88; N.T. at 46, 12/2/88.]

11. Between September 1985 and December 1987, the debtor repaid the general partner approximately $2.3 million. [N.T. at 88, 11/9/88.]

12. HUD scheduled Executive House for a non-judicial foreclosure sale on January 21, 1988. The debtor filed a voluntary petition in bankruptcy under chapter 11 on January 20, 1988.

13. On July 1, 1988 HUD received an appraisal report valuing the realty at a market value of $12,100,000.00 as of July 1, 1987 (Ex. D–11), and $12,100,000.00 as of September 1, 1987 (Ex. D–13). HUD apparently was prepared to sell this property at a non-judicial foreclosure sale for a sum not less than $11,459,000. (Ex. D–11, ¶ II, B.)

14. As of May 1, 1988, the fair value of Executive House was $12,900,000. (*See* Part V *infra* and appendix.)

15. As of May 1, 1988, the debtor had a vacancy rate of 47% as there were 147 vacant apartments. In November, 1988 there were 94 vacant apartments.

16. As of May 1, 1988 the debtor's real estate was in excellent condition.

17. Since filing its bankruptcy petition the debtor has accumulated approximately $500,000.00 in cash as income has exceeded expenses (without consideration of debt service). [N.T. at 78, 12/2/88.] (Ex. D–5A–5I.)

18. The debtor has obtained $1,348,000.00 in capital contributions from its limited partners, which has been placed in an escrow account.

19. The prepetition total debt to HUD was $22,564,974.00.

20. The debtor has proposed a plan of reorganization, Ex. D–7 (Ex. F) with the following terms as the plan relates to HUD's claim: monthly payments of $107,013.05 for forty years to repay HUD's allowed secured claim and an extremely small monthly payment on HUD's allowed unsecured claim for forty years beginning five years after confirmation. If HUD elects to have its claim treated as fully secured under 11 U.S.C. § 1111(b)(2), then HUD will receive monthly payments of $90,000.00 for fifteen years and a balloon payment of $18,900,300.05.

## II.

I reach the following conclusions of law:

1. HUD holds a valid security interest in the real property known as the Executive House, located at 6100 City Line Avenue, Philadelphia, Pa.

2. HUD holds a valid security interest in the rents derived from that real estate.

3. The First Amended Plan of Reorganization filed by the debtor does not adequately protect HUD's security interest, pursuant to 11 U.S.C. § 362(d)(1).

4. The First Amended Plan of Reorganization could not be confirmed over HUD's opposition.

5. If provided a brief period of time, the debtor may be able to propose a plan of reorganization that could be confirmed and

which would adequately protect HUD's security interests.

6. HUD is not entitled to relief from the automatic stay at this time. 11 U.S.C. § 362(e).

### III.

The debtor argues that HUD does not hold a perfected security interest in the subject real property as against a *bona fide* purchaser and that HUD's interest may therefore be avoided by the debtor-in-possession exercising the "strong-arm" powers of 11 U.S.C. § 544(a).[1] The debtor's contention is premised solely upon *Friedley v. Hamilton*, 17 Sarg. & Rawle 70 (1827), a venerable Pennsylvania Supreme Court decision. In order to understand the debtor's position, it is necessary to understand both the *Friedley* decision and the document which was filed with respect to Executive House, which document HUD characterizes as a "mortgage".

In Pennsylvania, it has long been held that the principal distinction between a deed, which conveys title, and a mortgage, which creates a security interest, is the "defeasance" provision of a mortgage. In other words:

A mortgage is in essence a defeasible deed requiring the grantee to reconvey the property held as security to the grantor upon satisfaction of the underlying debt or the fulfillment of established conditions.

*Hahnemann Medical College & Hosp. v. Commonwealth*, 52 Pa.Cmwlth. 558, 416 A.2d 604, 607 (1980). *Accord, e.g., Pearce v. Wilson*, 111 Pa. 14 (1885). This is not to suggest that the mortgagee holds any right of title, legal or equitable, for in Pennsylvania it does not. *See, e.g., Bailis v. Reconstruction Fin. Corp.*, 38 F.Supp. 721 (E.D.Pa.1941), *aff'd*, 128 F.2d 857 (3d Cir.1942); *In re DiToro*, 22 B.R. 392 (Bankr.E.D.Pa.1982); *In re City of Philadelphia, Fortieth Ward*, 360 Pa. 589, 63

A.2d 42 (1949). However, it has long been understood that a mortgagee is distinguished from a grantee by the former's contractual duty to "reconvey" its interest to the grantee upon satisfaction of the debt.

Although not favored in this form, *Jaques v. Weeks*, 7 Watts 261, 269 (Pa.1838), mortgage agreements in Pennsylvania were formerly represented, on occasion, by two documents: a deed absolute from the mortgagor to the mortgagee, and a defeasance agreement from the mortgagee to the mortgagor. Taken together, these two documents represented the mortgage. *Id.*

*Friedley* involved a loan of $6,000.00 from father to son with the father taking back a mortgage in the manner just described: a deed absolute and a separate defeasance agreement. The deed was recorded but the defeasance agreement was not. After the deed alone was recorded, two judgments were entered against the son. When the real property was later sold, the father instituted suit claiming priority in the proceeds of sale ahead of the judgment lien creditors. The Pennsylvania Supreme Court held that the failure to record the defeasance agreement misrepresented the true nature of the transaction and represented a fraud or potential fraud upon the creditors of the son. Thus, the court viewed the transaction as the equivalent of an unrecorded mortgage[2] that provided the original mortgagee with no priority over duly perfected judgment lien creditors. *Accord Jaques v. Weeks*.

The debtor here relies upon the *Friedley* doctrine because the evidence is uncontroverted that the mortgage agreement entered into between the debtor and VNB Mortgage Co. was missing a defeasance clause. The mortgage agreement, Ex. G–A, is derived from a form agreement, Ex. G–H; the filed mortgage is lacking page two of the form. On page two is found the following defeasance clause:

---

[1] Pursuant to 11 U.S.C. § 1107(a) a debtor-in-possession may utilize the trustee's powers under § 544(a). *See, e.g., Hartman Paving, Inc.*, 745 F.2d 307, 309 (4th Cir.1984); *In re Mc-*

*Govern Auto Specialty, Inc.*, 51 B.R. 511, 513 (Bankr.E.D.Pa.1985).

[2] *See, e.g., Corpman v. Baccastow*, 84 Pa. 363, 365 (1877).

Provided however that if said Mortgagor does and shall well and truly pay or cause to be paid unto the said Mortgagee, the aforesaid debt in principal sum secured by this mortgage, on the day and time and in the manner hereinbefore mentioned and appointed for payment of the same, together with interest and all sums advanced for payment of any ground rents, taxes, water rents, changes, claims or insurance premiums and any other advance hereunder as aforesaid, without any fraud or further delay and without any deduction, defalcation or abatement to be made of anything, for or in respect of any ground rents, taxes or water rents or changes or claims or advances whatsoever, then this mortgage and the estate hereby granted shall cease and become void.

Ex. G–H.

Absent this provision, the debtor notes that the mortgage agreement states only:

The Mortgagor for valuable consideration, the receipt of which is hereby acknowledged, hath granted, bargained, sold, aliened, enfeoffed, released, and confirmed, and by these presents doth grant, bargain, sell, alien, enfeoff, release unto the said mortgagee all the following described real estate:  ....

Ex. G–A.

Thus the debtor argues, basically, that HUD holds an "unrecorded mortgage" and its interest may be avoided by the use of the strong-arm powers found in 11 U.S.C. § 544(a).  *See generally Sommers v. International Business Machines*, 640 F.2d 686 (5th Cir.1981); *In re Southern*, 32 B.R. 761 (Bankr.D.Kan.1983).

I have no difficulty accepting the debtor's argument that the validity of HUD's security interest as against a hypothetical *bona fide* purchaser or lien creditor is determined by reference to non-bankruptcy law, generally state law.  *See Butner v. United States*, 440 U.S. 48, 99 S.Ct. 914, 59

L.Ed.2d 136 (1979);  *In re Ryan*, 851 F.2d 502 (1st Cir.1988).  Stated slightly differently, the debtor-in-possession's rights and powers granted by § 544(a) are generally determined by state law.  *McCannon v. Marston*, 679 F.2d 13 (3d Cir.1982); *In re J. Robert Pierson, Inc.*, 44 B.R. 556 (E.D. Pa.1984);  *In re Mitchell*, 80 B.R. 350 (Bankr.W.D.Pa.1987);  *In re Jones*, 20 B.R. 988 (Bankr.E.D.Pa.1982);  *In re American Mortg. & Financial Co.*, 5 BCD 769 (Bankr.N.D.Fla.1979).  That is, state law governs the existence *vel non* of secured interests asserted by parties in a bankruptcy proceeding.  *In re Duffy–Irvine Associates*, 39 B.R. 525 (Bankr.E.D.Pa.1984);  *In re Carr*, 18 B.R. 794 (Bankr.E.D.Pa.1982).  *See generally* 4 *Collier on Bankruptcy* ¶ 544.02 at 544–8 to –9 (15th ed. 1988).

I also agree that the *Friedley* holding has never been overruled.  Thus, if applicable, it is binding upon me.[3]  However, I conclude, for the following reasons, that *Friedley* is inapplicable and that HUD holds a valid security interest in the debtor's real estate.

First, the debtor assumes that the absence of a defeasance clause, by itself, converts the instant document into a fee simple deed.  Pennsylvania law, though, has long held that if there are sufficient indices in the recorded document to place a third party on notice of inquiry that a mortgage was intended, then the document will be treated as a recorded mortgage.  *E.g.*, *Garber v. Henry*, 6 Watts 57 (Pa.1837).  *See Commissioner v. Penn Athletic Club Bldg.*, 176 F.2d 939 (3d Cir.1949); *Pearce v. Wilson*.  *See also Dalton v. Peters*, 119 F.2d 494, 497 (8th Cir.1941) (under Missouri law, "an express provision of defeasance is not essential to characterize an instrument as a mortgage.  If, from its nature, either standing alone or read in light of the surrounding circumstances, it appears to have been given as a security, it must be con-

---

**3.**  While *Friedley* represents an understandable attempt to prevent fraud and enforce recording statutes, *see, e.g., Jaques v. Weeks*, it does have the potential to harm creditors of the "mortgagee."  They may have provided goods or services, or entered into loan transactions based, in part,

upon the recorded deed absolute.  By invalidating the transaction as secured, *Friedley* is diminishing the estate of the mortgagee.  Thus the *Friedley* position is not self-evident.  *See Jaques v. Weeks*, 7 Watts at 277 (Kennedy, J.).

sidered a mortgage."); *Bybee v. Stuart,* 112 Utah 462, 189 P.2d 118 (1948); *Hart v. Hill,* 305 Ky. 216, 203 S.W.2d 13 (1947).

Here, there were many indices to disclose to an innocent third party that the document recorded was intended as a mortgage as between the debtor and VNB. The document itself is called a "Mortgage," and recorded as a mortgage; the parties are referred to as mortgagor and mortgagee. The document details the amount of indebtedness, the interest rate charged, as well as the payment schedule and amount of monthly payments. Attached to the mortgage document itself, and also recorded, was a "Regulatory Agreement" which identified the debtor as owner and HUD as mortgagee. *Cf. Garber v. Henry.* Furthermore, a review of the recorded document reflects that part of the text is missing. The sentence at the end of the first page is not completed on the second. The second page begins with clause number 4 while the first page makes no mention of clauses one through three.

In *Jaques v. Weeks,* the Pennsylvania Supreme Court explained the rationale of the *Friedley* holding as follows:

> The great object of the recording act is, to compel those who claim a priority of consequence or lien to place the true nature of the transaction on record, so that all may have recourse to it for correct information; but if the deed would be recorded without defeasance, a false notice of the transaction is given. To allow this to be valid leave it in the power of the parties to hinder and defeat purchasers and creditors, by making that which was in reality a mortgage bear the appearance of an absolute deed, or otherwise, just as it suits their purposes. The mortgagee may thus become a secret trustee for the mortgagor as to the surplus beyond the money actually due …

It is quite clear that no third party would be misled by the character of the document recorded into believing that it was a deed conveying legal title to VNB. That being so, the holding of *Friedley* is inapposite.

Second, if I were to conclude that the document recorded was a deed, and misleading in character from that intended by the parties, such a conclusion on these facts would not invalidate the filing as to a subsequent *bona fide* purchaser. As noted in *Jaques v. Weeks,* the holding of *Friedley* was designed to prevent the mortgagor and mortgagee from disguising the true nature of their transaction and then disclosing that true nature at their discretion. Such a holding has meaning only when there exists a signed separate unrecorded document. Here, there was no such opportunity to alter the nature of the document recorded for there was no separate unrecorded agreement. Thus the concerns addressed by *Friedley* do not apply here.[4]

Finally, and perhaps most important, the debtor misunderstands the meaning of *Friedley* as it applies to subsequent grantees. Even if I were to conclude that the transaction between the debtor and VNB Mortgage Co. is governed by *Friedley* and that it represents an unrecorded mortgage agreement, HUD, as assignee from VNB, would prevail against a later *bona fide* purchaser from the debtor.

Although *Friedley* had held that where a deed is recorded but the defeasance agreement is not, a subsequent lien holder or grantor would have priority over the original mortgagee, *Friedley* never concluded that the original security agreement was void. As between the original parties, there was a valid mortgage agreement. *See Manufacturers' and Mechanics' Bank v. Bank of Pennsylvania,* 7 Watts 335 (Pa.1844). *See also Hopkins v. Albee York Homes, Inc.,* 42 D. & C.2d 211 (C.P.York 1967). And as to third parties with "actual notice of the true state of the case" the original mortgagee had priority. *Manufacturers' and Mechanics' Bank v. Bank of Pennsylvania,* 7 Watts at 340.

*Jaques v. Weeks,* decided ten years after *Friedley,* addressed the relative priority positions of third parties who took from both the original mortgagor and mortgagee. In

---

**4.** The debtor's contention might cause the document to be viewed as a recorded deed, not an unrecorded mortgage—a result which the debtor would not suggest as appropriate.

*Jaques,* the facts, somewhat simplified, were as follows: Knapp mortgaged real estate in favor of Crocheron by way of deed and a separate defeasance agreement. Only the deed was recorded. Crocheron then conveyed his interest to Jaques who did not know of the unrecorded defeasance agreement. Knapp, who had remained in possession throughout, then transferred his interest in the realty to Weeks who was viewed by the court as a *bona fide* purchaser.

Weeks argued that his interest held priority over Crocheron's based upon the holding of *Friedley.* Since Jaques now held Crocheron's interest, Weeks argued that he should also prevail over Jaques. The Supreme Court of Pennsylvania disagreed.

First, it reasoned that Knapp, the original grantor, would not be allowed to defeat Jaques' interest.

> It never could be permitted to Knapp to make an absolute deed, and allow his grantee to sell under it to an innocent purchaser, and then destroy the title by producing a concealed defeasance. A bona fide purchaser (by which I mean one purchasing without notice), taking the title on the faith of a recorded deed executed by one having the title, would not be suffered to be defrauded by any secret collusion or private defeasance that may have existed as between his grantor and the person from whom he derived his title. A purchaser without notice holds, though his vendor had notice.

*Id.,* at 271.

Next, it reasoned that Jaques could not assert that he held fee simple title, even though he was the grantee from a grantor with a recorded deed, because Knapp was in possession when he purchased his interest from Crocheron. This represents an early statement of the principle that open possession of real property generally constitutes constructive notice to third parties of the rights of the party in possession. "Such possession, *even in the absence of recording,* obliges any prospective subsequent purchaser to inquire into the possessor's claimed interests, equitable or legal, in that property." *McCannon v. Marston,* 679 F.2d 13, 16 (3d Cir.1982). *See also In re R.A. Beck Builders, Inc.,* 66 B.R. 666 (Bankr.W.D.Pa.1986); *Kinch v. Fluke,* 311 Pa. 405, 166 A. 905 (1933); *Long John Silver's, Inc. v. Fiore,* 255 Pa.Super. 183, 386 A.2d 569 (1978).

Finally, the court concluded that it would be inequitable to view Jaques, who had done nothing improper, and who actually had no notice of the defeasance, to be viewed as the assignee of an unrecorded mortgage. Rather, it was determined that he had purchased a mortgage interest with priority over Weeks. Weeks, in essence, was viewed as having constructive notice of the grant of interest to Crocheron and then Jaques. *See Jeanes v. Hizer,* 186 Pa. 523, 40 A. 785 (1898) (purchaser so takes subject to mortgage interest whose document of record is sufficient to establish duty of inquiry).[5] As the Court stated in *Jaques:*

> [I]f we recur to first principles, it would seem that the utmost that could fairly be implied from the possession by another person than the grantor is, that such possessor has some claim or title to the land, and therefore the purchaser, generally speaking, is to be considered as taking subject to such claim or title. Knapp therefore remaining in possession, and Jaques agreeing with a knowledge of such possession to purchase from Crocheron, might perhaps be considered as having notice of the claim of Knapp as mortgagor by virtue of the defeasance. But I am not able to go the length of saying, that he thereby also had notice

---

**5.** The debtor's reliance upon *In re Ryan* is misplaced. There, the First Circuit Court of Appeals concluded that, under Vermont law, a deed not properly witnessed is invalid, even if recorded, as to all subsequent purchasers. In essence, it is treated as an unrecorded deed whether a subsequent purchaser is aware of it or not. No constructive notice is permitted. In Pennsylvania, *Jaques* and later decisions (*e.g., Manufacturer's and Mechanical Bank*) establish that constructive notice is possible. Moreover, the matter *sub judice* concerns a dispute between two grantees from the original parties to the transaction. *Ryan* is a dispute between the trustee as hypothetical purchaser and the original grantee.

that such defeasance was not recorded, and therefore was a purchaser of an unrecorded mortgage. This it seems to me would be to heap construction on construction, to infer that there existed a defeasance, and also that such defeasance was not recorded; whereas, in the absence of any actual notice, the presumption would be, that Knapp, holding possession under a claim which the law required to be recorded to give it full validity and effect, had had it recorded according to law. The fact that it was not recorded was no notice of that fact to Jaques, because, as he did not know of its existence, he could not be expected to search for it.

I am therefore of the opinion that at the utmost the effect would be that Jaques bought the fee simple subject to the defeasance and liable to the equity of redemption, having a prior equity over any subsequent purchaser, and entitled on the case before us to recover the premises and hold them till he is paid the amount advanced by Crocheron to Knapp with interest, or the sum be paid to Crocheron if greater than that, with costs of suit.

*Id.*, at 272–73.

In the instant drama, if I were to view the failure of the debtor and VNB to record a mortgage with a defeasance provision as the functional equivalent of failing to record a defeasance agreement and only recording a fee simple deed, HUD, as ultimate grantee from VNB, would be viewed as a *bona fide* assignee of the mortgagee and the trustee viewed as a subsequent *bona fide* purchaser from the debtor. The trustee as hypothetical purchaser under § 544 is subject to the state law of constructive notice. *McCannon v. Marston.* Assuming that the trustee may have prevailed, on his theory, against VNB, he does not prevail against a good faith assignee

from VNB. Therefore, applying Pennsylvania law, HUD holds a security interest in the debtor's real estate which may not be avoided by the trustee.

## IV.

Also at issue is whether HUD has a valid perfected security interest in the rents paid by occupants and tenants of the subject premises. If HUD has such a valid interest, then it may likewise be entitled to adequate protection of that interest and a right to postpetition rents and fees pursuant to § 552(b). *See, e.g., United Sav. Assoc. v. Timbers of Inwood Forest Assocs., Ltd.,* 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988); *Smith v. Dairymen, Inc.,* 790 F.2d 1107 (4th Cir.1986); *In re Nielsen,* 48 B.R. 274 (D.N.D.1984); *In re Garden Manor Assocs,* 70 B.R. 477 (Bankr. N.D.Cal.1987).[6] The threshold consideration is whether federal or state law is employed in deciding what acts are necessary to perfect an interest in rental income pursuant to a purported assignment of rents clause in a HUD Regulating Agreement or HUD-held mortgage. *United States v. Landmark Park & Assocs.,* 795 F.2d 683, 684 (8th Cir.1986) (*"Landmark Park"*).

The Supreme Court has held that state law determines whether a mortgagee has an enforceable interest in rents collected postpetition, "[u]nless some federal interest requires a different result." *Butner v. United States,* 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979).[7] Shortly thereafter the Court identified such a federal interest in *United States v. Kimbell Foods, Inc.,* 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979), where it directed that "federal law governs questions involving the rights of the United States arising under nationwide federal programs." 440 U.S. at 726, 99 S.Ct. at 1457. Under the principle established in *Clearfield Trust*

---

**6.** The burden of proof on the issues of the validity, priority, or extent of an interest in the rents is on HUD, the movant. 11 U.S.C. § 363(*o*)(2).

**7.** Although *Butner* construes the Bankruptcy Act of 1898, the validity of *Butner* is not disturbed by the enactment of the Bankruptcy Code of

1978 or subsequent amendments. *See, e.g., In re Village Properties, Ltd.,* 723 F.2d 441, 443 (5th Cir.1984), *cert denied,* 466 U.S. 974, 104 S.Ct. 2350, 80 L.Ed.2d 823 (1984); *In re Jones,* 77 B.R. 981, 983 (Bankr.M.D.Ga.1987); *In re Jenkins,* 13 B.R. 721, 723 (Bankr.D.Colo.1981), *rev'd on other grounds,* 19 B.R. 105 (D.C.Colo.1982).

*Co. v. United States,* 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943), that the rights and duties of the United States on its commercial paper are governed by federal common law, the *Kimbell* court held that when federal agencies lend funds by the authority of federal legislation, their rights as lenders also derive from and warrant the protection of federal law. 440 U.S. at 726–27, 99 S.Ct. at 1457–58.

Drawing upon the above doctrines, the Eighth Circuit in *Landmark Park* concluded, in part, that federal rather than state law controls the manner in which HUD may perfect its interest in rental income. This conclusion was predicated upon dual concerns: the "overriding federal interest in protecting the funds of the United States and in securing federal investments," *Landmark Park,* 795 F.2d at 686, *quoting United States v. Victory Highway Village, Inc.,* 662 F.2d 488, 497 (8th Cir.1981), and in the need to protect the "purposes and integrity of nationwide federal lending programs," *id.* Noting that HUD was a national federal mortgage lender, the court held that there was a federal interest in uniformity of the law applied to HUD security instruments. Because state law is not uniform on the question of how a mortgagee can perfect its interest in rents, the court determined that a uniform federal rule was necessary. *Id.,* at 686–87. *Accord United States v. Floral Park Dev. Co.,* 619 F.Supp. 144, 147–48 (S.D.Ohio 1985) (assignment of rent provisions in favor of HUD operates, under federal and not state law, to cause those funds to become HUD's upon default); *United States v. American Nat'l Bank & Trust Co.,* 573 F.Supp. 1319, 1321–22 (N.D.Ill.1983) (federal law governs whether HUD has perfected its interest in personalty, treasury bills, purchased with postpetition rents); *In re Garden Manor Assocs,* 70 B.R. at 484. *Cf. United States v. Spears,* 859 F.2d 284 (3d Cir.1988) (determining whether single, national standard or state law is to be applied

when foreclosing on a Farmers Home Administration mortgage).

■ Thus, in *Landmark Park* the court found that HUD need take no affirmative action other than recording the loan documents to perfect its security interest in the rents, where, as there, the assignment provisions create an entitlement to rents in favor of HUD which is immediately activated and perfected upon the debtor's default. *Landmark Park,* 795 F.2d at 687. The rule arising from this holding is that rent assignment provisions in HUD mortgages and Regulatory Agreements may be enforced according to their terms and, to the extent state law requires otherwise, that state law is replaced with this federal rule. *See In re Buckley,* 73 B.R. 746, 748 (D.S.D. 1987). *Landmark Park* thus instructs that, in the instant case, as the mortgage assignment to HUD (and each predecessor assignment) was duly recorded, the assignment of rents provisions in the debtor's mortgage now held by HUD[8] and in the Regulatory Agreement between these parties are to be enforced according to their own terms.

■ The relevant language in the parties' mortgage and Regulatory Agreement (which is incorporated in and made a part of the mortgage by paragraph 11 of that document) includes the following:

> It is further agreed that the holder of this mortgage, in any action to foreclose, shall be entitled to the appointment of a Receiver of the rents and profits of the mortgaged premises as a matter of right and without notice, with power to collect the rents, ... due and become due during the pendency of such foreclosure suit, such rents and profits being hereby expressly assigned and pledged as additional security for the payment of the indebtedness secured by this mortgage, without regard to the value of the mortgaged premises or the solvency of any person or persons liable for the payment

8. That HUD was not the original mortgagee does not disturb this result. *See United States v. Floral Park Dev. Co.* (HUD second assignee of mortgage and original insurer of same; operation of rent assignment provisions in mortgage deed and Regulatory Agreement established HUD's entitlement on day of default, even though HUD became holder of the mortgage after default occurred).

of the mortgage indebtedness.... The provision for the appointment of a Receiver of the rents and profits, and the assignment of such rents and profits, is made an express condition upon which the loan hereby secured is made. The rights and remedies herein provided for shall be deemed to be cumulative and in addition to, and not in limitation of, those provided by law.

Ex. G–J, Mortgage, ¶ 11. The Regulatory Agreement provides in pertinent part:

11. Upon a violation of any of the above provisions of this Agreement by Owners, the Secretary may give written notice, thereof, to Owners,.... If such violation is not corrected to the satisfaction of the Secretary within thirty (30) days after the date such notice is mailed or within such further time as the Secretary determines is necessary to correct the violation, without further notice the Secretary may declare a default under this Agreement effective on the date of such declaration of default and upon such default to Secretary may:

....

(b) Collect all rents and charges in connection with the operation of the project and use such collections to pay the Owner's obligations under this Agreement and under the note and mortgage and the necessary expenses of preserving the property and operating the project;

. . . . .

12. As security for the payment due under this Agreement ... the Owners respectively assign, pledge and mortgage to the Secretary their rights to the rents, profits, income and charges of whatsoever sort which they may receive or be entitled to receive from the operation of the mortgage property, subject, however, to any assignment of rents in the insured mortgage referred to herein. *Until a default is declared under this Agree-*

*ment, however, permission is granted to Owners to collect and retain under provisions of this Agreement such rents, profit, income and charges, but upon default this permission is terminated as to all rents due or collected thereafter.*

(Emphasis supplied.) The "Secretary" is identified in the introductory paragraph as "the undersigned Secretary of Housing and Urban Development and his successors;" the document is signed on behalf of HUD by "The Federal Housing Commissioner By: /s/ W. Oliver–Leggett, Area Manager."

These two documents make clear that certain acts are required of HUD in order to perfect its interest in rents. The owners are permissively entitled to the rents until a default is declared as described in the Agreement. This places a burden upon HUD to affirmatively act before its right to the rents becomes complete: it must declare a default under the provisions of paragraph 11 of the Agreement by providing written notice of the violation and permitting the Owner a minimum of thirty days to correct the violation before declaring default.

On September 24, 1987, a letter was sent from HUD's Regional Administrator to Alan Feingold, c/o Jack W. Blumenfeld & Co., regarding Executive House. Ex. G–R.[9] This letter identifies the Secretary of HUD as the holder of a note secured by a first mortgage on that property and as signatory with Executive House Associates to a Regulatory Agreement. The letter itemizes various delinquencies and states that there exists a mortgage default, and requests that all delinquencies be corrected within thirty days of the notice. "Failure to make this payment within the 30 day period shall be considered a default under the Regulatory Agreement and, in addition to all of our rights and remedies thereun-

**9.** The debtor argues in its posttrial memorandum of law that a default was not declared under the Regulatory Agreement because HUD did not establish that the sender of the September 24 letter was the "Secretary of HUD, or that allegedly in his capacity as the Regional Administrator, he was the lawful designee of the Secre-

tary for the purpose of sending a notice of violation of the Regulatory Agreement." I disagree. The letter, typed on HUD stationery, is signed by a "Regional Administrator" of HUD. In fact, the Regulatory Agreement is not signed by the Secretary. The debtor did not present evidence to challenge the sender's authority.

der, we will declare, without further notice, the entire indebtedness to be immediately due and payable." At the expiration of this thirty day period, as the debtor "failed to correct within the specified time all of the violations of the Regulatory Agreement as set forth in [the] letter of September 24, 1987," HUD declared a default under the regulatory agreement. *See* Ex. G–S (letter dated November 4, 1987). Upon this declaration of default, which HUD was allowed to declare without notice, *see* Ex. G–J, Regulatory Agreement at ¶ 11, the debtor's permissive ability to collect and retain rents terminated. That right, under the terms of the parties' documents, then vested in HUD. Under federal law, HUD had perfected its security interest in the project rents prepetition.

I note that these requirements upon HUD were absent from the *Floral Park Dev. Co., American Nat'l Bank & Trust Co.,* and *Landmark Park* assignment provisions, where the language of the agreements clearly shows that the parties intended an interest in rents to be perfected upon default. *In re Buckley,* 73 B.R. at 749. In those cases the assignment provisions on behalf of HUD provided:

> That all rents, profits and income from the property covered by this mortgage are hereby assigned to the Mortgagee for the purpose of discharging the debt hereby secured. Permission is hereby given to the Mortgagor so long as no default exists hereunder, to collect such rents, profits and income for use in accordance with the provisions of the Regulatory Agreement.

■ This arrangement, quoted from paragraph 4 of the mortgage deed, is the same arrangement found in the parties' Regulatory Agreement. *Floral Park Dev. Co.,* 619 F.Supp. at 147. These provisions,

identical to those before the court in *American Nat'l Bank & Trust Co.* and *Landmark Park,* create an entitlement to rents in favor of HUD "which is immediately activated and perfected upon the debtor's default." *Landmark Park,* 795 F.2d at 687. The event of default is sufficient under those terms to entitle the mortgagee to an automatic secured interest in the rents, the assignment being absolute and unconditional.[10] *See also In re Garden Manor Assocs.,* 70 B.R. at 484 (HUD Regulatory Agreement and mortgage permit automatic entitlement to rents). *Cf. In re Jones,* 77 B.R. 981 (Bankr.M.D.Ga.1987) (title-passing security deed containing an unconditional rent assignment automatically entitled the creditor, Farmers Home Administration, to those rents). In contrast, the documents in this dispute do contain language requiring affirmative acts by HUD to perfect its interest in rents. HUD has taken the steps required of it under these documents and so I find it has perfected its interest under applicable federal law.

## V.

■ Having concluded that HUD holds a secured claim against the debtor's main asset, its real estate, I must now value that secured claim. On the issue of valuation, the parties agree that the secured claim shall be determined as of May 1, 1988,[11] and that HUD was owed a total of $22,564,-974.30. Furthermore, both parties agree that HUD was an undersecured creditor in that the total debt exceeded the value of the collateral. 11 U.S.C. § 506(a), (d). *See generally United States v. Ron Pair Enterprises, Inc.* —— U.S. ——, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989); *In re Mihalko,* 87 B.R. 357 (Bankr.E.D.Pa.1988). Their

---

**10.** The facts of *American Nat'l Bank & Trust Co.* are distinguished from the other two cases in that its deed of trust also entitled HUD to the appointment of a receiver to collect rents, as does the mortgage *sub judice.* The District Court held that HUD's right to the rents was not conditioned upon that remedy. *Id.,* 573 F.Supp. at 1322 n. 5. Similarly, I find the provisions for the appointment of a receiver to collect rents to be optional in an action to foreclose, and is a

remedy "cumulative and in addition to, and not in limitation of, [rights and remedies] provided by law." Mortgage, paragraph 11 (Ex. G–J). These provisions do not govern the perfection of HUD's interest in the rents.

**11.** I accept the valuation date selected by the parties without considering the correctness of that choice.

dispute arises in that they differ significantly as to the value of the collateral.

Extensive valuation testimony was offered by the parties, largely though the testimony of two qualified expert witnesses and their lengthy appraisal reports. Ex. G–CC; Ex. D–5. In sum, HUD's expert testified that the building had a fair market value of $14,500,000.00 while the debtor's expert testified that the building was worth only $9,200,000.00. In order to understand why these conclusions were so different, and why I differ to some degree with both conclusions, it is necessary to detail the experts' methodologies and assumptions. This detail demonstrates that appraising a large commercial building is not an "exact science." *In re Mikole Developers, Inc.,* 14 B.R. 524, 526 (Bankr.E.D.Pa.1981).

Both experts considered the three basic approaches to real estate valuation: replacement cost approach; market comparison; and income stream analysis. The replacement cost approach was viewed by both appraisers as irrelevant to the concerns of a hypothetical prospective buyer. Market comparison was also deemed an inappropriate approach because there were no recently sold residential apartment buildings that were comparable in location, building condition, type of financing, and vacancy rate upon which to base this comparison. Both therefore agreed that a potential purchaser's bid for this property would have to be based upon the return to be derived from the building; further, it was agreed that this return is best determined by utilizing the income approach.

The experts even agreed upon the methodology involved in preparing an appraisal based upon income. Both valued the real estate by calculating the income, less expenses, generated by the property over a ten year period; added to the figure is the value of the building at the end of the tenth year, discounted to present value. To arrive at this summation it was necessary to establish: gross annual income for the ten year period; annual expenses for that same period; transaction costs to sell the real estate after ten years; a rate of return on investment demanded by a buyer of the property after the tenth year (the "terminal cap rate"); and the rate of return demanded by the initial purchaser over the ten year period (the "capitalization rate").

The expert opinions differed because the experts disagreed as to each of the five components listed above. For example, the debtor's expert estimated that annual expenses would be greater than did HUD's expert. HUD's expert believed that less time would be needed for the debtor to achieve full occupancy in its building (defined as 95% occupancy rate) than did the debtor's expert. They differed as to capitalization rate because the debtor's expert viewed the risk of ownership as greater, thereby demanding a greater rate of return. Their guesses as to the cost of a sale ten years hence (e.g., brokers' commissions and local and state transfer taxes) differed by 100% (i.e., 5% versus 10%). For purposes of simplicity, they assumed that income and expenses will increase annually at a rate of 5% per year once the building were fully occupied. They also agreed that the building, which was only three years old, was in fine condition.

I shall detail my income analysis in an appendix to this opinion, but I note at this point my conclusion that as of May 1, 1988, Executive House had a fair market value of $12,900,000. I reach this conclusion by accepting, to a large extent, the debtor's estimate of expenses, as its expert had much better access to information on this point. Similarly, I accept the debtor's income data, although I conclude that it will take about three years, not four, to become fully rented. (In fact, at the time of the hearing the occupancy rate had increased to more than 70%.) I differ with the debtor's expert on his determination of capitalization rates. Essentially, he overemphasized the May 1988 vacancy rate as a risk factor. HUD's expert gave ample support for his use of a 12.5% initial rate of return followed by a 9.5% terminal cap rate. Finally, I view a figure of 7.5%, which is midway between the two expert guesses, as a reasonable estimate of the costs of sale at the end of ten years.

I also note that this valuation is quite close to appraisal values obtained by HUD from two other appraisers, *see* Exs. D–11, D–13, and is consistent with the minimum bid HUD established for its prepetition, non-judicial foreclosure sale.

## VI.

I must finally turn to HUD's request that it be granted relief from the automatic stay in order to resume foreclosure. The relevant provision is 11 U.S.C. § 362(d) which states:

> (d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—
>
> (1) for cause, including the lack of adequate protection of an interest in property of such party in interest; or
>
> (2) with respect to a stay of an act against property under subsection (a) of this section, if—
>
> (A) the debtor does not have an equity in such property; and
>
> (B) such property is not necessary to an effective reorganization.

Although the issues in these two subsections are often discussed separately, in this dispute the issues overlap.

The parties agree, and I have just concluded, that HUD is an undersecured creditor. Its claim is equal to and limited by the value of the property. 11 U.S.C. § 506(a). As the concept of equity in § 362(d)(2)(A) refers to the "difference between the property value and the total amount of liens against it," *e.g., In re Jug End in the Berkshires, Inc.*, 46 B.R. 892, 901 (Bankr. D.Mass.1985), it is clear that HUD has met its burden under § 362(g)(1) of showing that there is no equity in this property. Under § 362(g)(2), the debtor has the burden of demonstrating that the realty is "necessary to an effective reorganization."

The Supreme Court recently defined that phrase:

> What this requires is not merely a showing that if there is conceivably to be an effective reorganization, this property will be needed for it; but that the property is essential for an effective reorganization *that is in prospect.* This means, as many lower courts ... have properly said, that there must be "a reasonable possibility of a successful reorganization within a reasonable time."

*United Sav. Assoc. v. Timbers of Inwood Forest Assocs., Ltd.,* 108 S.Ct. at 632 (emphasis in original) (citation omitted).[12]

The debtor also has the burden of demonstrating that HUD's security interest is adequately protected pursuant to subsection 362(d)(1). *See, e.g., In re Allstar Bldg. Products, Inc.,* 834 F.2d 898 (11th Cir.1987) (en banc).[13] Here, the adequate protection offered comes from the terms of the plan itself. *See generally In re 1616 New Hampshire Ave. Associates,* 85 B.R. 298, 309 (Bankr.E.D.Pa.1988); *In re Hester,* 39 B.R. 194 (Bankr.E.D.Va.1984).[14] Thus the proposed plan terms hold the key to whether HUD is entitled to relief from the automatic stay.[15]

---

**12.** The question of whether a reorganization plan is reasonably possible, raised early in a bankruptcy case and not at a confirmation hearing, is a variant on the "good faith" requirement found in former chapter X of the Bankruptcy Act of 1898. *Compare In re Holi–Penn, Inc.,* 535 F.2d 841 (3d Cir.1976); *In re Northeast Corp.,* 519 F.2d 1360 (4th Cir.1975).

**13.** The movant, HUD, has met its initial burden of production by establishing that the debtor has failed to tender any postpetition mortgage payments. *See, e.g., In re Munoz,* 83 B.R. 334 (Bankr.E.D.Pa.1988); *In re Wright, Egan & Associates,* 60 B.R. 806 (Bankr.E.D.Pa.1986).

**14.** As noted below, though, the ability to propose a plan which may be confirmed pursuant to § 1129, and which provides for the claim of a secured creditor, does not mean that the interest of that secured creditor is always adequately protected. While the issues inherent in § 362(d)(1) and (d)(2)(B) may overlap, they are not identical.

**15.** At trial, HUD suggested that the debtor's payments to its general partner, while the loan to HUD was not being repaid, violated the terms of the Regulatory Agreement. (Ex. G–J.) I note, though, that HUD has not raised this point in its posttrial memorandum; moreover, no HUD default or demand notice, Exs. G–HH, G–R, or G–S, makes any mention of these repayments as basis for the loan default. HUD should have been aware of the repayments from the finan-

In order to meet its burdens, the debtor offered into evidence a proposed First Amended Plan of Reorganization, Ex. D–7 (exhibit F), along with supporting documents such as a plan classification schedule and a fund application description. (Exs. 8–9.) From these documents, it is apparent that HUD holds the largest claim by far, of $22,564,947.64.[16]

The nature and size of HUD's claim dominate this chapter 11 case. In whatever manner HUD is classified pursuant to 11 U.S.C. § 1122, its claim will be the largest of its class. As a result, HUD's opposition to the plan, pursuant to its vote under § 1126, will result in an impaired creditor class voting against the plan.[17] *See* 11 U.S.C. § 1126(c). Moreover, this opposition would preclude confirmation under § 1129(a) because the provisions of § 1129(a)(8) could not be met.[18]

The debtor acknowledges this problem, but argues that it has proposed a viable plan, despite HUD's certain opposition. When all the elements of § 1129(a) are met except for those of subsection (a)(8), confirmation may be obtained under § 1129(b). In order to achieve confirmation under the "cram down" provisions, it is required that "the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." 11 U.S.C. § 1129(b)(1).

Because HUD's claim was without recourse, it has the right to elect under § 1111(b). By agreement of the parties, HUD's duty to elect, pursuant to Bankr.R.

3014, was delayed pending the outcome of this litigation. As a result, the debtor's proposed plan of reorganization is made in the alternative. If HUD does not elect under § 1112(b)(2), then the debtor proposes to pay HUD the value of its allowed secured claim, $12,900,000, over a 40 year period (the original mortgage agreement, Ex. G–J, was for approximately 40 years) at an interest rate of 9.75%, the mortgage interest rate.[19] Required monthly payments under this proposal would be $107,013.05. The plan also proposes partial payment of HUD's unsecured portion of its claim as follows: the relatively modest value of the non-real estate assets will be determined;[20] HUD will then be entitled to a percentage of this value, equal to the percentage that its unsecured claim holds to the total of unsecured claims against the estate. Payments are to be made over a period of 40 years, discounted at 9.75% and beginning five years after the plan is effective.

If HUD does elect under § 1111(b)(2), then it will hold no allowed unsecured claim. In that event, the debtor proposes to pay HUD $90,000.00 per month for 15 years and then either sell the real estate or refinance its obligation and pay HUD $18,900,300.50. HUD contends that neither proposal fulfills the debtor's obligations under § 1129(b)(2). If the debtor cannot establish a reasonable likelihood that it can offer a plan that may be confirmed over HUD's objection, then HUD is not adequately protected, there is no reorganization "that is in prospect," and relief from

---

cial reports submitted by the debtor to HUD. Therefore, I need not decide whether the debtor's payments to its general partner, which the debtor maintained were loan repayments, violated the terms of the Regulatory Agreement and, if so, whether such a violation would be "cause" to grant relief from the automatic stay.

**16.** Ex. D–8 lists few prepetition creditors. The only claim of any size comparable to that of HUD is an unsecured claim of the general partners which is listed at $6,074,460.97.

**17.** The debtor does not challenge that its proposed plan impairs HUD's claim within the meaning of § 1124.

**18.** Section 1129(a)(8) states:

(a) The court shall confirm a plan only if all of the following requirements are met:
  (8) With respect to each class of claims or interests—
  (A) such class has accepted the plan, or
  (B) such class is not impaired under the plan.

**19.** HUD does not challenge the use of the contract rate. Therefore, I shall assume that this rate constitutes the appropriate discount rate for purposes of § 1129(b).

**20.** The debtor's schedules, Ex. G–DD, state that assets other than the real estate, Executive House, approximately total only $110,000.

the stay should be granted. *See, e.g., In re 6200 Ridge, Inc.,* 69 B.R. 837 (Bankr.E.D. Pa.1987).[21]

The provisions of § 1129(b)(1) that concern this dispute may be summarized as follows:[22] to the extent that HUD exercises the § 1111(b)(2) election, it must receive at least the present value of its allowed secured claim, $12,900,000, and undiscounted payments equal to the value of its entire claim, $22,564,974. To the extent HUD does not elect under § 1111(b)(2), then it must receive payments equal to the present value of its allowed secured claim plus it must receive the present value of its allowed unsecured claim if the interests of the general and limited partners are not extinguished and those junior interests will receive a distribution under the plan. *Northwest Bank Worthington v. Ahlers,* 485 U.S. 197, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988); *In re Stegall,* 85 B.R. 510 (C.D.Ill. 1987), *aff'd,* 865 F.2d 140 (7th Cir.1989). In the debtor's proposed plan, partnership interests are to be retained, but allowed unsecured claims will only receive a small dividend. Since the partners are to contribute $1,348,000 under the plan, Ex. D–9, the debtor must be assuming that an exception exists to the absolute priority rule embodied in § 1129(b) for new capital contributions. This issue was expressly left open in *Ahlers,* 108 S.Ct. at 966 n. 2.[23]

If the new value exception to the absolute priority rule did not survive the enactment of the Bankruptcy Reform Act of 1978, then the debtor cannot propose a viable plan. As HUD notes, if it does not elect under § 1111(b)(2), then the debtor would be required to make payments under its plan of $187,189.67 per month for 40 years (again, using a discount rate of 9.75%). Neither the cash flow from the

property alone (see appendix) nor the cash flow in conjunction with the contribution from the partners would come close to providing yearly payments of approximately $2,250,000.

If the new value exception does apply, then the plan requires monthly payments of only $107,013.50 per month, or approximately $1,280,000 per year. By my estimate, the net income from the apartment house beginning in the fourth year will provide sufficient yearly revenues to fulfill this obligation. *See* appendix. During the first three years, net revenues would total only $2,500,000. A $1,200,000 contribution would leave the debtor approximately $140,000 short of the sum needed.[24] In all likelihood, this deficiency could be met by applying the accrued interest of the partner's contribution or by slightly increasing the contribution amount.

■ If HUD elects under § 1111(b)(2), the plan's likelihood of success is uncertain. A 15 year plan paying an allowed secured claim of $12,900,000 at 9.75% in regular monthly installments would require payments of approximately $1,370,000 or $1,640,000 per year. The debtor is proposing to pay only $1,080,000 per year with a final balloon payment of $18,900,000 after 15 years. I agree with the Fifth Circuit Court of Appeals, at least in the context of a motion under § 362(d), that such a plan is so risky it does not afford HUD's claim adequate protection. *Matter of D & F Constr., Inc.,* 865 F.2d 673 (5th Cir.1989). *See also In re Seem,* 92 B.R. 134 (Bankr.E. D.Pa.1988).

■ Essentially, the debtor is suggesting that HUD could be compelled to accept repayment of its secured debt at a rate of 3.15% for fifteen years, followed by a pay-

---

**21.** As this bankruptcy case is no longer in its infancy, the debtor's burden under § 362(d)(2)(B) is not lessened. *See Timbers,* 108 S.Ct. at 632–33.

**22.** The complex provisions of § 1129(b)(1), (2) were explained in Klee, *All You Ever Wanted To Know About Cram Down Under The New Bankruptcy Code,* 53 Amer.Bankr.J. 133 (Spring 1979). The author is identified as former "associate counsel to the House Judiciary Committee

and one of the principal draftsmen of the new Code...." *Klee,* at 133 n. **.

**23.** Neither party has addressed this issue in its extensive memoranda.

**24.** The $1.2 million contribution is the portion that is to be used toward repayment of HUD's claim. The balance of the contribution is intended to pay administrative, priority, and general unsecured claims.

ment equal almost to the value of the property. (While I recognize that the Executive House has a projected resale value in ten years of approximately $19,300,000, there was no evidence presented as to its value five years later.) Such a proposal places virtually all of the risks associated with this plan upon the secured creditor. Assuming, and HUD has not challenged, that § 362(d)(2) allows a debtor in a one-asset, no-equity chapter 11 bankruptcy case to utilize the sole asset, *see generally In re 6200 Ridge, Inc.*, it does not allow the debtor, especially in light of the adequate protection requirement, to make use of the property for many years and retain a significant portion of the proceeds, while relegating the creditor to look to the collateral at the end of that period for the recovery of most of its claim.[25]

█ As the plan now stands, I agree with HUD that it could not be confirmed over HUD's objections, if HUD elects under § 1111(b)(2), even if the new value exception is valid. However, consistent with my discretion under § 362(d), *see In re Shariyf*, 68 B.R. 604, 606 (E.D.Pa.1986), I will grant the debtor a brief extension to amend its plan to address the shortfalls

outlined above. With additional partner contributions, and greater use of projected cash flows, it may be possible for the debtor to propose payments which adequately protect HUD's interest and could be confirmed over this creditor's objection. At the same time, if HUD wishes to raise the question of the new value exception it will be given the opportunity to do so.[26]

## VII.

In conclusion, I find that HUD holds a valid security interest in both the Executive House and its rental income. This interest has not been adequately protected by the debtor's first amended plan (or this plan could not be confirmed over HUD's opposition). However, there is a reasonable possibility that the debtor could amend its plan to protect HUD's interest as well as achieve confirmation, even if HUD were to object. Since all the proceeds from the property are being used to pay normal operating expenses connected with the realty, with the excess placed in a separate account, HUD's motion for relief preliminarily will be denied. *See* 11 U.S.C. § 362(e). The debtor will be allowed five business

25. The Fifth Circuit held that this risk renders the plan not "fair and equitable" within the meaning of § 1129(b)(1) when the creditor's objection is raised by opposition to confirmation rather than by way of a motion for relief from the automatic stay. I am not faced with that issue. I am also not faced with evidence disclosing that the sole asset will appreciate significantly postpetition. Here, the anticipated postpetition improvements in vacancy rates and rental income have already been considered in determining present value. Moreover, the physical condition of the property must diminish over a 15 year period, which may well affect its value.

26. In its posttrial submission, HUD also claimed that the debtor was using its cash collateral, the rents, without adequately protecting HUD's interest, as required by 11 U.S.C. § 363(e). Given the parties' trial stipulation as to the issues before me [N.T. at 111–13, 12/2/88], I am not certain that this issue is properly before me. Moreover, the question of adequate protection under § 363(e) is intertwined in this contested matter with the question of adequate protection under § 362(d). This is essentially a one-asset case, and the debtor is using the proceeds from that asset to maintain the realty, pay normal operating expenses, increase the rentals, and

fund a plan. If the debtor cannot protect HUD's interest in the real estate as required by § 362(d)(1), HUD should also prevail under § 363(e). Conversely, if HUD's interest in the realty is protected, then its interest in the rents from that realty may also be protected:

> When the collateral consists of the entire interest in real estate, including the right to rents, the right to rents should not be considered in isolation from the entire property interest. To the extent that the debtor applies rental income to the operation and maintenance of the property (which the Debtor has been doing here), the mortgagee may be considered to be adequately protected.

*In re Prichard Plaza Assocs Ltd. Partnership*, 84 B.R. 289, 301–02 (Bankr.D.Mass.1988) (citations omitted).

HUD, of course, may raise this issue again when I consider whether to grant relief from the stay as to the realty at the final hearing. At this stage, I shall allow the debtor to use the rents solely for maintenance and normal operating expenses—any payments to general partners are prohibited. Excess rents shall continue to be set aside pending final resolution of this dispute.

days [27] from the date of the entry of the order accompanying this opinion to amend its plan; a final hearing on HUD's motion for relief shall be heard within thirty days from the entry of the order. *Id.*

### APPENDIX

I.     Income Approach Assumptions

Capitalization rate: 12.5% (compounded annually)
Terminal cap rate: 9.5%
Sale costs after ten years: 7.5% of purchase price
Three years to obtain full occupancy
Income and expenses after year four increase by 5% annually

II.     Projected Net Operating Income

| Year | Income | Expenses | Net |
|---|---|---|---|
| 1. | $1,685,338 | $1,185,338 | $ 500,000 |
| 2. | 2,186,514 | 1,386,514 | 800,000 |
| 3. | 2,633,218 | 1,433,218 | 1,200,000 |
| 4. | 2,909,601 | 1,500,000 | 1,409,601 |
| 5. | 3,055,082 | 1,575,000 | 1,480,083 |
| 6. | 3,207,836 | 1,653,750 | 1,554,086 |
| 7. | 3,368,228 | 1,736,438 | 1,631,790 |
| 8. | 3,536,639 | 1,823,259 | 1,713,380 |
| 9. | 3,713,471 | 1,914,422 | 1,799,049 |
| 10. | 3,899,145 | 2,010,143 | 1,889,002 |
| 11. | 4,094,102 | 2,110,651 | 1,983,451 |

III.     Present Value Calculations—12.5%

| Year | Discount Factors | Net Income Reduced to Present Value |
|---|---|---|
| 1. | .888889 | $444,444.50 |
| 2. | .790123 | 632,098.40 |
| 3. | .702332 | 842,798.40 |
| 4. | .624295 | 880,006.86 |
| 5. | .554929 | 821,340.98 |
| 6. | .493270 | 766,584.00 |
| 7. | .438462 | 715,477.91 |
| 8. | .389744 | 667,779.57 |
| 9. | .346439 | 593,581.65 |
| 10. | .307946 | 581,710.61 |

IV.  Discounted Net Income Stream Over Ten Years = $6,945,822.88.

V.  Residual Value After Ten Years:

(a)  11th year net income–1,983,451
Divided by Terminal cap rate 9.5%
= $20,878,431.58

(b)  less costs of sale (7.5%)
–$20,878,431.58 minus $1,565,882.37
= $19,312,549.21

(c)  discounted to present value
$19,312,549.21 × .307946
= $5,947,222.28

VI.  Total Present Fair Market Value
$6,945,822.88 + 5,947,222.28
= 12,893,045.16 Rounded to $12,900,000.

---

**27.** By agreement, the parties have limited the debtor's time within which to file an amended plan, based upon this opinion, to "five working days." *See* N.T. at 111, 12/2/88.